John H. SMELSER, Jr., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–635C.

United States Court of Federal Claims.

Aug. 29, 2002.

532

M. Edward Owens, Knoxville, Tennessee, for the plaintiff.

Martin F. Hockey, Jr., Washington, D.C., with whom were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant. Ivan Boatner, Asst.

Regional Counsel, Department of Energy, Oak Ridge, Tennessee, of counsel.

## OPINION & ORDER

BUSH, Judge.

In this lawsuit, plaintiff, who entered into a settlement agreement with the U.S. Department of Energy (DOE) pursuant to which he was permitted to remove equipment from various DOE facilities, seeks monetary damages for the government's alleged breach of the agreement. Currently pending before the court is the defendant's motion for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Also pending before this court is the plaintiff's motion to compel discovery. For the following reasons, defendant's motion for summary judgment is granted in part and denied in part, and plaintiff's motion to compel discovery is denied.

## BACKGROUND

### I. Factual Background

#### A. Factual Recitation

In 1985, Congress withdrew support for the Department of Energy's Portsmouth Gas Centrifuge Enrichment Plant (GCEP), designed to enrich uranium, that was being constructed at DOE's Piketon, Ohio facility (Portsmouth; Portsmouth facility). At the time funding was withdrawn, the buildings supporting the plant were nearing completion, but the actual equipment designed to accomplish the enrichment mission was in various stages of completion. Some of the equipment had been installed, but much of the equipment had not even been removed from the boxes used to ship it to the site.

Faced with the cancellation of the GCEP program, DOE entertained suggestions from the industry on how to minimize the financial loss of the almost completed GCEP facility. One such offer came from a group of scientists interested in using the centrifuge processes located at the plant to purify non-radioactive isotopes for commercial purposes. In turn, on November 27, 1987, DOE entered into an agreement with these scientists, who had formed a company, All Chemical Isotope Enrichment, Inc. (AlChemIE), pursuant to which AlChemIE agreed to occupy a portion of DOE's GCEP facility in order to conduct its planned business of refining non-radioactive isotopes for commercial purposes.

This agreement included a provision that enabled AlChemIE to remove and sell certain surplus equipment located at the GCEP facility at no cost to DOE. AlChemIE would then use the profits from these sales to help offset some of the startup costs it anticipated incurring. The agreement provided that once production commenced, the government would be reimbursed ten percent of the profits of the enterprise. Following execution of the agreement, AlChemIE retained John Smelser, the plaintiff in this matter, to assist in the start-up of the new company.

Before AlChemIE completed the removal/liquidation effort, and before commencing its planned activities, the agreement between AlChemIE and DOE expired. In the interim, AlChemIE was experiencing financial difficulties and subsequently declared bankruptcy. By order dated August 14, 1990, the bankruptcy court released the remaining unclassified and uncontaminated equipment not removed by AlChemIE for disposition by secured creditors. This unclassified/uncontaminated equipment was subject to a security interest filed by Anderson County Bank in connection with loans it had made to AlChemIE.

On November 28, 1990, Anderson County Bank (bank) and Mr. Smelser entered into an agreement whereby Mr. Smelser purchased from the bank such of the remaining unclassified/uncontaminated equipment as he might select. Mr. Smelser agreed to pay $700,000 for this right of selection, which was later reduced to $500,000, reflecting a settlement of certain unrelated disputes between Mr. Smelser and the bank. Eventually, Mr. Smelser paid between $250,000 and $300,000, which the bank accepted as full settlement as part of an overall settlement between Mr. Smelser and the bank, that included terms requiring the bank to return $50,000 to Mr. Smelser, and to forgive other claims it had against Mr. Smelser. In return, Mr. Smelser released the bank from his claims against the bank, including his claim against AlChe-

**534**

mIE's assets for a $400,000 finders fee, and transferred to the bank certain real estate valued at approximately $400,000 that had been in dispute between the parties.

By letter of September 30, 1991, Mr. Smelser notified the bank and DOE that he had selected all of the remaining unclassified/uncontaminated equipment except for certain equipment stands. DOE challenged Mr. Smelser's right to the equipment, and Mr. Smelser subsequently commenced a legal action to obtain the equipment. On January 23, 1992, DOE and Mr. Smelser entered into two contracts in settlement of continuing litigation between the parties over the extent of Mr. Smelser's rights to the GCEP equipment.

The first contract, entitled Access Agreement for Equipment Removal, No. DE–AC05–92OR22033 (Access Agreement) allowed Mr. Smelser access to DOE's GCEP facility for the limited purpose of removing certain equipment. The other contract, Material and Services Order Form, ERD–92–1071, covered costs of DOE security, health and safety services as well as DOE assistance coordinating Mr. Smelser's removal of equipment from the GCEP facility. The equipment to be removed pursuant to the Access Agreement was identified in a list prepared by DOE's maintenance and operating contractor, Martin Marietta Energy Systems (later Lockheed Martin) that was incorporated into the contract. Both parties recognized at the time of contract formation that the list was not accurate. As many as 217 of the items contained on the list had already been removed by AlChemIE. However, the parties deferred any determination about the 217 items until the conclusion of the removal activities.

During the course of the removal operations as specified in the Access Agreement, the parties were in conflict over many issues, essentially relating to what Mr. Smelser was entitled to remove and certain DOE charges for its services. As a result, the parties entered into the Equipment Transfer and Settlement Agreement (Equipment Transfer Agreement; Settlement Agreement; Agreement), designed to resolve the differences between the parties. *This Equipment Transfer Agreement is the contract that is at issue in this litigation.*

The Equipment Transfer Agreement provided in paragraph 1 that Mr. Smelser could remove: (a) GCEP equipment specifically listed in exhibit A to the Equipment Transfer Agreement; and (b) certain types of additional GCEP equipment meeting the conditions identified in exhibit B to the Equipment Transfer Agreement. In paragraph 2, the Agreement provided that Mr. Smelser could remove: Excess equipment listed in exhibit C to the Equipment Transfer Agreement, along with other equipment determined to be excess by DOE during the term of the Equipment Transfer Agreement. In addition, the Equipment Transfer Agreement outlined the cost of security, health and safety services to be provided by DOE in connection with Mr. Smelser's removal of equipment from DOE facilities.

Exhibit A to the Equipment Transfer Agreement consists of a list of GCEP property that Mr. Smelser had requested during the performance of the Access Agreement contract, but did not remove. The list identifies each piece of equipment by identification number, description, and location. Exhibit B to the Equipment Transfer Agreement consists of identified equipment located in three specific GCEP buildings at the Portsmouth Gaseous Diffusion Plant at Piketon, Ohio: the R/A building, Process Building No. 1 (PB–1; PB No. 1) and the Feed and Withdrawal building (F & W building), along with certain enumerated equipment located in various yards adjacent to these buildings. Pursuant to the Agreement, Mr. Smelser had six months from the effective date of the Agreement to conclude any removal activities allowed by paragraph 1. During performance of the contract, however, DOE agreed to extend the six-month removal period for the equipment identified in exhibits A and B from December 10, 1993 to equal that of the twelve-month period during which Mr. Smelser could remove excess equipment, June 10, 1994.

Although much of the equipment identified in exhibit B is specifically identified, the exhibit does provide that other non-specified items located in specifically described areas

within the R/A building were subject to removal. Further, the Equipment Transfer Agreement provides that Mr. Smelser was free to propose other items located within the R/A building for removal, but the DOE's determination of availability of such items was final and not subject to the disputes clause of the contract. Exhibit B provides that unclassified, uncontaminated items within PB–1 and the F & W building were subject to removal, to the extent the items were not required to support minimal building services.

With respect to excess equipment, the Equipment Transfer Agreement specifically provided that Mr. Smelser would be permitted access to "the items described in Exhibit C" to the Equipment Transfer Agreement as well as "other equipment determined to be excess by DOE from its Oak Ridge, Tennessee, Paducah, Kentucky, and Piketon, Ohio (PORTS) sites during the term of this Agreement." Appendix at 1. The term of the Agreement was twelve months, effective June 10, 1993. The Equipment Transfer Agreement provides that any excess equipment offered to Mr. Smelser, but not removed at the expiration of the Agreement, shall be deemed abandoned. The Equipment Transfer Agreement precluded Mr. Smelser from removing classified or contaminated equipment by providing that "Smelser is not authorized to have access to classified information and shall not attempt to remove any equipment which is classified or contaminated with special nuclear material." Appendix at 3.

During performance of the Equipment Transfer Agreement, the parties again began to experience difficulties, usually related to whether Mr. Smelser had rights to remove certain equipment. With respect to Mr. Smelser's access rights as delineated in exhibits A and B, the disputes relate to Mr. Smelser's claims to certain equipment that DOE concluded was not subject to removal, as well as what Mr. Smelser considered to be DOE's poor support of his removal operations. Regarding Mr. Smelser's rights to equipment stemming from the "excess equipment" provisions of the Equipment Transfer Agreement, the disputes relate to specific equipment and other property on which the parties disagree as to their classification as "excess."

## B. Plaintiff's Complaint

In his complaint, Mr. Smelser seeks a judgment against the defendant in the amount of $503,266,375 plus any additional damages of which the plaintiff may learn during discovery; and such other or further relief as the court deems just.

In Count I of his complaint, plaintiff contends that DOE breached its obligation under paragraph 1 of the Agreement to permit Mr. Smelser to remove equipment and breached its obligation of good faith and fair dealing under paragraph 8 of the Agreement. In this regard, plaintiff contends that:

(1) DOE "wrongfully withheld from Mr. Smelser many items that DOE had agreed Mr. Smelser could remove." Mr. Smelser contends that the total value of these wrongfully withheld items is at least $2,614,425;

(2) Numerous items that Mr. Smelser was to remove "disappeared" from the GCEP facility. Plaintiff contends that these items were evidently removed by DOE or its agents, and only DOE and its agents have complete knowledge of exactly what items there were. Mr. Smelser estimated the value of those items to be $100,000 at the time of the complaint; and

(3) He was forced to incur additional overhead costs as a direct result of DOE's "arbitrary and unreasonable delays in releasing materials for removal." Mr. Smelser contends that breaches by DOE damaged him in the amount of $551,950.

In Count II, plaintiff contends that DOE breached its contract under paragraph 2 of the Agreement to permit Mr. Smelser to remove excess items, and breached its obligation of good faith and fair dealing under paragraph 8 of the Agreement, by wrongfully withholding excess materials from him. Plaintiff further avers that DOE wrongfully transferred to the United States Enrichment Corporation excess materials to which it was not entitled and which should have instead

been transferred to Mr. Smelser. Mr. Smelser estimates the damages for the allegedly wrongfully withheld items to have a value in excess of $500,000,000.[1]

## II. Procedural Background

Plaintiff filed his complaint in this matter on September 21, 1995. On December 14, 1995, defendant filed its answer and counterclaim. On January 3, 1996, plaintiff filed its answer to defendant's counterclaim. The parties engaged in extensive discovery, and this matter was reassigned to the undersigned on January 27, 1999. On November 14, 2000, plaintiff filed his motion to compel discovery and memorandum in support thereof. On June 12, 2001, defendant filed his response to plaintiff's motion to compel discovery. On June 22, 2001, plaintiff filed his reply to defendant's response to plaintiff's motion to compel.

The government filed its motion for summary judgment on April 8, 2002. Included with this motion are two volumes of appendices. Also on April 8, 2002, defendant filed its proposed findings of uncontroverted fact. Plaintiff filed his response to defendant's proposed findings of uncontroverted fact and his proposed findings of uncontroverted fact on May 22, 2002. Also on this date, plaintiff filed his response to defendant's motion for summary judgment. The court also filed by leave the affidavit of John H. Smelser and the deposition of James David Huddleston. On June 13, 2002, defendant filed its reply to plaintiff's opposition to defendant's motion for summary judgment and its response to plaintiff's proposed findings of uncontroverted fact. On June 13, 2002, defendant filed its response to plaintiff's proposed findings of uncontroverted fact.

On July 1, 2002, the court raised *sua sponte* the issue of whether Mr. Smelser had certified his March 2, 1995 claim to the contracting officer pursuant to the Contract Disputes Act, 41 U.S.C. § 605(c)(1) and ordered the parties to submit the certification. On

July 12, 2002, the parties submitted a copy of this certification.

## DISCUSSION

### I. Standard of Review

This action is before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. Summary judgment is designed to secure the " 'just, speedy, and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. at 2510.

In considering a motion for summary judgment, the court does not "weigh[ ]" each side's evidence. *Contessa Food Products, Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002). Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 285 F.3d 1013, 1017 (Fed. Cir.2002). That is, all doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2554;

---

1. The court notes that in his complaint Mr. Smelser seeks damages of $503,266,375, whereas in his claim before the contracting officer he sought damages of $2,614,425 for "Refusal to Release Materials;" damages of $100,000 for "Items that

Disappeared from GCEP Facility;" damages of $551,950 for "Overhead Costs Incurred by Delays;" damages of $150,000 for "Excessive Billing by DOE;" and no specific dollar value for "Excess Material."

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511; and *Mingus,* 812 F.2d at 1390–91.

## II. Merits of Defendant's Motion for Summary Judgment

### A. Mr. Smelser's claims for equipment under the Equipment Transfer Agreement

#### 1. Cranes

■ Mr. Smelser seeks damages in Count I of the complaint for various overhead cranes he claims DOE forbade him to remove. Included within the specifically identified equipment on exhibits A and B of the Access Agreement were various overhead cranes that were eligible for removal from the GCEP facility. Exhibit A identified 21 cranes. They are listed as line items 44, 45, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, and 92. Exhibit B identified 15 cranes, however, 5 of the 15 cranes identified in exhibit B were also identified in exhibit A. The cranes listed on exhibit B were the cranes located on the 5th floor of the R/A building and the 2 overhead cranes in the western 2 bays of the PB No. 1 building. Thus, a total of 31 cranes were identified in the Agreement as being eligible for removal. Appendix at 8–13. During performance of the Equipment Transfer Agreement, DOE agreed to turn over an additional 13 cranes not listed in either exhibit A or B of the Equipment Transfer Agreement, in response to Mr. Smelser's requests. DOE airgapped and turned over the following additional 13 cranes:

4 monorail cranes in the CTTF section of the R/A building;

3 jib cranes from the test stand in the CTTF section of the R/A building;

1 overhead crane in the Feed and Withdrawal building

4 jib cranes in the Feed and Withdrawal building; and

1 jib crane left on gateline of R/A building.

This brought the overall total of cranes eligible for removal to 44 cranes. Appendix at 132.

Before Mr. Smelser could remove the cranes from DOE's facilities, DOE had to prepare the cranes for removal by airgapping them. Airgapping is the process by which electrical hookups are disconnected from the cranes. During the one-year period commencing June 9, 1993, DOE airgapped all 44 cranes; however, Mr. Smelser only removed 15 of the cranes. Appendix 132 at ¶ 4–6. The government speculates that Mr. Smelser did not remove the cranes because either he did not have a buyer for the cranes, or the cost of their removal exceeded their value.

Of all these cranes, Mr. Smelser only removed 6 of the cranes listed on exhibit A. The government contends the rest of the cranes on exhibit A were "abandoned" in place by plaintiff; that he "abandoned" all of the cranes listed on exhibit B; and that Mr. Smelser "abandoned" the 4 monorail cranes in CTTF and the jib crane on gateline of R/A building. *See* discussion *infra.* In sum, Mr. Smelser left 29 cranes and took only 15 of the 44 cranes.

Additionally, the parties mutually agreed to a trade of a fireproof crane listed on exhibit A for 8 inter-plant transfer vehicles (IPTs). The fireproof crane had to be retained by DOE for handling flammable waste stored in the R/A building.

#### a. Allegedly Abandoned Cranes

Mr. Smelser contends that he was unable to remove most of the cranes because of DOE's lack of cooperation or outright refusal to release them. The parties disagree as to whether the cranes were timely airgapped or abandoned. Concerning abandonment, the contract provides that "[a]ny equipment on Exhibits A and B not removed at the end of said six months shall be deemed abandoned by Smelser, and DOE may dispose of it as it deems appropriate." Appendix at 2. The contract specifies no date by which DOE was to have the cranes airgapped and ready for removal. During the course of contract performance, Mr. Smelser complained of DOE delays in releasing the cranes to him, and DOE agreed to extend the deadline for removal of items on exhibits A and B for an additional six months, from December 10, 1993 until June 10, 1994, the same date as the expiration of the "Removal of Equipment from Other DOE Facilities" portion of the

contract. Plaintiff contends, however, that even during the additional six-month period, DOE still "did not provide the necessary support to assist Mr. Smelser in removing them." Plaintiff's Opposition at 6. Mr. Smelser further avers that he "had been unable to afford keeping his work crews idle at the site awaiting DOE's completion of the airgapping... [b]y the time DOE finally released the cranes, Mr. Smelser did not have the time or manpower to remove them." Plaintiff's Opposition at 6.

The parties apparently disagree as to when the various cranes were ultimately released to Mr. Smelser. The government contends that all cranes specifically identified in the contract, including the 5th floor cranes, were released prior to the expiration of the first six-month period. The government contends that certain additional cranes located in the F & W building were not formally accepted by Mr. Smelser until January 7, 1994. Mr. Smelser, however, contends that many cranes were not made available to him until "shortly before the final, 12 month deadline of his contract." Plaintiff's Opposition at 6. Specifically, in his proposed findings of uncontroverted fact, plaintiff states that:

> Most of the cranes were not released for removal until a few weeks before the June 10, 1994 deadline. In the meantime, Mr. Smelser could not afford to keep his removal crews sitting around for months waiting on this equipment to be released, and had let them go. Mr. Smelser had been able to remove 15 small cranes earlier, but was unable to remove the remaining cranes under the circumstances in the short time left to him.

Plaintiff's Proposed Findings of Uncontroverted Fact at 14–15.

Upon consideration of the parties' arguments and factual assertions, several genuine issues of material fact emerge regarding the abandoned cranes. The most that the court can ascertain from reviewing the appendix is that all of the cranes were undoubtedly available "a few weeks" prior to the end of the

contract and that Mr. Smelser removed only fifteen of the forty-four cranes. Significant material issues remain, however, as to (1) when the cranes were made available to Mr. Smelser; (2) whether it was reasonable for the government to make at least some of the cranes available only a "few weeks" prior to the deadline for removal, and (3) whether it would have been possible for Mr. Smelser to remove all of the cranes during that period of time. Issues also remain as to (1) when Mr. Smelser removed his workmen from the site; and (2) how many cranes Mr. Smelser would have been able to remove even if the government had released the cranes earlier, as Mr. Smelser removed his workmen from the site at some point well before the completion of the performance period.[2] Accordingly, summary judgment is not appropriate at this juncture regarding plaintiff's claim for the abandoned cranes.

### b. CTTF Cranes

■ Mr. Smelser claims that he is entitled to two overhead cranes located in the CTTF area of the R/A building. However, neither of these cranes are specifically identified in the Equipment Transfer Agreement, which does specifically identify thirty-one cranes, including other cranes located in the CTTF. The government contends that DOE's refusal to release the two CTTF area overhead cranes was reasonable, as removal would have jeopardized the structural integrity of the building. The government states the two cranes are integral to the building structure, as they are built into the walls and roof of the CTTF. According to the government, it would have been necessary to remove the roof of the structure to remove the cranes. Mr. Smelser testifies in his own affidavit that these cranes were in fact not integral to the building's structure and their removal would not have necessitated removal of a portion of the building's roof.

The Settlement Agreement is to be interpreted as a contract. *Greco v. Department of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988) (stating that: "It is axiomatic that a settle-

---

**2.** The court notes that Mr. Smelser's claim that he was unable to remove all the cranes based on the government's delay is entirely distinct from his claim that he incurred overhead based on the government's delay in airgapping the claims, which is discussed separately *infra*.

ment agreement is a contract. Equally settled is the principle that interpretation of the terms of a contract is a question of law."). Contract interpretation is a question of law generally amenable to summary judgment. *Varilease Technology Group, Inc. v. United States,* 289 F.3d 795, 798 (Fed.Cir.2002) (citing *Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998)). Contract interpretation begins with the plain language of the documents that comprise the contract. *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). A contract must, however, be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract. *See id.* An interpretation that gives reasonable meaning to all of a contract's parts is preferred to one which " 'leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *Id.* (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)).

Mr. Smelser bases his contention that he was entitled to the CTTF cranes upon the contract provision contained in exhibit B that provides he could remove "[a]ny and all uncontaminated, unclassified items in the CTTF." Appendix at 13. However, the contract is silent as to CTTF cranes, specifically. This fact is critical in view of the fact that all other cranes to be made available pursuant to the Agreement's exhibits A and B are specifically identified. For example, in identifying items eligible for removal from the R/A building, 5th floor, the contract provides that "any or all remaining items on the 5th floor...," Appendix at 13; however, the contract also specifically identifies the 5th floor cranes as being eligible for removal. This provides a useful juxtaposition to the contract language concerning the CTTF, which does not mention CTTF cranes, despite the inclusion of the same general language concerning uncontaminated, unclassified items being available for removal. *Id.* Further, all the other cranes intended to be removed were specifically listed. For example, exhibit B lists "[t]wo overhead cranes located in the western two bays of PB–1." *Id.* In this case, the court will be guided by the doctrine of *Expressio Unius est Excusion Alterius*—

"Where certain things are specified in detail in a contract other things of the same general character relating to the same matter are generally held to be excluded by implication." *See Nicholson v. United States,* 29 Fed.Cl. 180, 196 (Fed.Cl.1993) and cases cited therein. Thus, the most reasonable interpretation of the Equipment Transfer Agreement is that where cranes are specifically delineated elsewhere in the contract, they would also be specifically mentioned in the portion of the contract pertaining to the CTTF where both contract sections contain identical language regarding the removal of uncontaminated, unclassified items if the cranes were to be included in the scope of the contract for removal by Mr. Smelser.

Moreover, as previously stated, the court must construe a contract so as to "effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *Gould,* 935 F.2d at 1274. The court is not to interpret a contract so as to "achieve a weird and whimsical result." *Id.* It would be a strange result indeed if Mr. Smelser were permitted to remove CTTF cranes that are integral to the structure of the building without express permission to do so. The government states that in order for Mr. Smelser to remove the cranes, he would have had to remove a portion of the roof, as the cranes were installed as the building was being constructed and went in prior to the installation of the roof. Appendix at 107. This statement is supported by the affidavit of Paulette Williamson, the chief security official at the Portsmouth plant in Piketon, Ohio since 1978. Appendix at 133. Mr. Smelser's unqualified statement that he does not believe that the cranes were integral to the building fails to create an issue of disputed material fact. *Bromley Contracting Co. v. United States,* 15 Cl.Ct. 100, 105 (1988); *Carrier Corp. v. United States,* 6 Cl.Ct. 169, 175 (1984). Plainly, it would not be feasible to tear apart the roof in order for Mr. Smelser to remove the cranes, and it would defy logic to interpret the contract in this way. Moreover, if there is even a colorable issue as to whether these cranes are integral to the structure of the building this is evidence toward an interpretation of the contract that such cranes would have

needed to be specifically delineated in the contract, and would not simply fall under the general category of "[a]ny and all uncontaminated, unclassified items in CTTF." Appendix at 13.

Because Mr. Smelser has no entitlement to the CTTF cranes pursuant to the Settlement Agreement, there is no genuine issue of material fact concerning the cranes and summary judgment in favor of the government is appropriate as to this claim.

### c. Empty Casings

■ Mr. Smelser seeks the value of 120 empty casing that he claims DOE prevented him from removing from the GCEP facility. Casings are containers that were used to ship classified centrifuge equipment to the site. The Equipment Transfer Agreement identifies all "empty casings" in Process Building No. 1 as eligible for removal by Mr. Smelser. The government contends that it allowed Mr. Smelser to remove all uncontaminated empty casings that were discovered in the areas covered by the Equipment Transfer Agreement, some 20 empty casings. Appendix at 132–33 ¶ 7. Mr. Smelser contends that he "personally observed" a number of the casings in PB–1 to be empty, yet DOE has "refused to provide evidence" to Mr. Smelser that the casings were not empty and now claims that the casings were full. This bland, unsubstantiated allegation is insufficient to survive a motion for summary judgment. See RCFC 56(e) (stating that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial"). The chief security officer of the Portsmouth facility states in her affidavit that the casings contained either classified centrifuge, or related classified or contaminated centrifuge equipment not covered by the Equipment Transfer Agreement. Appendix at 133 ¶ 7. Also, the contracting officer's final decision states that the casing study performed by a private firm for Mr. Smelser indicates that there were only twenty-five empty casings. Appendix at 108.

The government also contends that DOE even allowed Mr. Smelser's personnel to select additional casings to determine whether they were empty, and none were discovered, an allegation which Mr. Smelser does not contradict. Id. at ¶ 8. Accordingly, there is no genuine issue of material fact concerning the allegedly empty casings, and the government is entitled to summary judgment regarding this aspect of plaintiff's claim.

### d. Caterpillar Generators

■ Mr. Smelser contends that DOE refused to release a "number of Caterpillar generators" worth $50,000 each. In support of this contention, Mr. Smelser relies upon the general language in exhibit B to the Agreement which provides that he would receive "all unclassified, uncontaminated items that are not required to support building operations." Appendix at 13. Plaintiff's reliance on this language is, however, misplaced, as the contract specifically states that plaintiff is entitled to "[t]wo of the four diesel generators (one at each end of PB–1)." Id. By the plain language of the contract, plaintiff was only permitted under the contract to receive two of the Caterpillar generators. The broad language on which plaintiff relies entitling him to "all unclassified, uncontaminated items that are not required to support building operations" does not entitle him to receive the additional two generators. Accordingly, based on the plain language of the contract, Mr. Smelser has no entitlement to these generators as it is a fundamental tenet of contract interpretation that a more specific contract clause takes precedence over a general contract clause relating to a particular matter. Hills Materials Co. v. Rice, 982 F.2d 514, 517 (Fed.Cir.1992). For the foregoing reasons, the government is entitled to summary judgment regarding Mr. Smelser's claims for the additional two Caterpillar generators in the PB–1 building.

Significantly, however, the court is unable to ascertain from Mr. Smelser's carefully worded opposition whether he actually received the two generators to which he was entitled under the contract, as he states that DOE refused to release a "number of Caterpillar generators" and relies upon the lan-

guage of the contract entitling him to "all unclassified, uncontaminated items..." rather than the contractual language entitling him to two diesel generators. It is also unclear from the government's briefs whether the government actually released the two generators to which Mr. Smelser was contractually entitled. Therefore, to the extent that Mr. Smelser is claiming that he did not receive the two generators to which he was contractually entitled, summary judgment is not appropriate at this juncture because there is no information before the court as to whether Mr. Smelser actually received the two generators to which he is entitled under the Agreement.

### e. Additional GCEP items claimed by Mr. Smelser

Mr. Smelser seeks the value of numerous GCEP items that he contends are included within the scope of the Equipment Transfer Agreement. Before addressing this portion of Mr. Smelser's claim, a brief review of the Equipment Transfer Agreement is necessary.

The Equipment Transfer Agreement did not provide Mr. Smelser with unfettered access to DOE's GCEP facility. Rather, the GCEP property that could be removed by Mr. Smelser was either listed in exhibit A to the contract, or identified in exhibit B to the contract. Appendix at 1, 8–13. Mr. Smelser's present claim of additional GCEP equipment focuses upon exhibit B of the Equipment Transfer Agreement. Appendix at 13.

Exhibit B identifies miscellaneous GCEP equipment that Mr. Smelser could remove in addition to the five-page list of equipment that comprises exhibit A. Appendix at 8–13. Exhibit B is divided into four sections based upon the building or area where the equipment was located, e.g., Recycle and Assembly building, Process Building No. 1, Feed and Withdrawal building, and outside storage areas adjacent to the three identified buildings. Appendix at 13. Within each section of exhibit B, the equipment subject to removal is identified either by name, specific location, or function. Id. For example, various cranes, generators, and vacuum pumps are specifical-

ly identified. Other loose items located within certain floors of the R/A building, or within the PB–1 and F & W buildings were permitted to be removed. Id. However, the Equipment Transfer Agreement imposes three limitations upon the equipment eligible for removal: The items cannot be needed to support minimal building services, nor can the items be classified or contaminated. Id.

### 1. Other R/A building items

Exhibit B, R/A item no. 7, provides that DOE could release other, unspecified items from the R/A building to Mr. Smelser. The Equipment Transfer Agreement provides that Mr. Smelser could request permission to remove property located within the R/A building that was not identified in the Agreement. The contract provides:

> Smelser may propose other items for removal. The determination by the DOE Representative on the availability of any such items for removal shall be final and not subject to the disputes provisions of Paragraph 8 of this Agreement.

Appendix at 13.

Mr. Smelser contends that prior to signing the contract, Mr. Smelser and Gene Gillespie, DOE's site manager at the Portsmouth facility, toured the facility and Mr. Gillespie agreed to release various electrical items from the R/A area of the building. Mr. Smelser contends these promises induced Mr. Smelser to sign the contract, yet, once the contract was signed, Mr. Gillespie "refused to release many of these items, valued by Mr. Smelser ... at $359,000." Plaintiff's Opposition at 8. Plaintiff contends that "[a]t the very least, these broken promises by Mr. Gillespie give rise to an inference that DOE was not dealing in good faith and fairly with Mr. Smelser." Id.

Mr. Smelser avers that DOE also refused to make available to him numerous items beyond those specified in the contract that were located in the CTTF area of the R/A building, including electrical equipment. Plaintiff contends that this constituted a clear violation of DOE's contract with Mr. Smelser.

This portion of plaintiff's claim, however, fails to state a claim upon which relief can be granted,[3] because the government's decision not to grant Mr. Smelser access to additional equipment is one that cannot be reviewed within the framework of the contract. That is, DOE's decision to refuse to release the numerous additional items, including electrical items, located in the CTTF area of the R/A building is wholly within the discretion of DOE, and no procedures exist within this court to review DOE's exercise of that discretion. As such, Mr. Smelser's challenges in this regard fail to state a claim upon which relief can be granted.

■ Mr. Smelser contends that he was induced into entering into the Agreement based upon certain promises made by Mr. Gillespie regarding the electrical items Mr. Smelser could remove from the R/A building. However, the contract provides that "[t]his Agreement is the entire agreement of the parties hereto." Appendix at 7. Moreover, the provision providing that the DOE representative possessed discretion as to whether to allow Mr. Smelser to remove "other items" that he proposed to remove is unambiguous. And where a contract is not ambiguous, extrinsic evidence may not be used to vary the terms of the agreement. *See Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988) (stating "[t]he general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face"); *Safeco Credit v. United States,* 44 Fed.Cl. 406, 419 (1999) (declining to import ambiguity into unambiguous language regarding accord and satisfaction in bilateral modification). Accordingly, Mr. Smelser is precluded from attempting to create obligations from representations that were not incorporated into the Equipment Transfer Agreement.

■ Moreover, plaintiff has presented no evidence that the government failed to act in good faith based on (1) Mr. Gillespie's alleged pre-Agreement representations to plaintiff as to the materials eligible for release; (2) Mr. Gillespie's acts during the performance of the contract; or (3) DOE's decisions during the course of the contract as to whether to release "other items" for removal upon Mr. Smelser's proposal.

There is a general presumption that government officials perform their duties in good faith. *Sanders v. United States Postal Service,* 801 F.2d 1328, 1331 (Fed.Cir.1986); *Spezzaferro v. Federal Aviation Administration,* 807 F.2d 169, 173 (Fed.Cir.1986). Government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *Asco–Falcon II Shipping Co., et al. v. United States,* 32 Fed.Cl. 595, 604 (1994). Thus, "in order for this court to find that defendant breached its *duty* of good faith, plaintiffs must *allege and prove,* by clear and strong evidence specific acts of bad faith on the part of the government." *Id.* (citation omitted) (emphasis in original). Indeed, it requires "well nigh irrefragable proof" to establish that the government acted in bad faith. *Kalvar Corp. v. United States,* 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (1976). Furthermore, a "bland allegation of disparate treatment does not, *ipso facto,* state an actionable claim. Plaintiffs must show a breach of a *contractual* obligation." *Asco–Falcon II,* 32 Fed.Cl. at 604 (emphasis in original). *See also The Libertatia Associates, Inc. v. United States,* 46 Fed.Cl. 702, n. 9 (2000). This being so, the plaintiff in this action has failed to allege sufficient evidence of bad faith to survive the government's motion for summary judgment. For example, plaintiff's generalized allegations regarding the "attitude" of Phil Houser, a Lockheed Martin[4] engineer who was advising Mr. Gillespie regarding release of items to Mr. Smelser, are wholly insufficient to survive the pending motion for summary judgment as to this claim. *See* Plaintiff's Appendix at 14. There is no evidence whatsoever in this

---

3. The court notes that RCFC 12(b)(6) states that if "matters outside the pleadings are presented to and not excluded by the court, the motion [to dismiss for failure to state a claim upon which relief can be granted] shall be treated as one for summary judgment and disposed of as provided in RCFC 56 ...."

4. Lockheed Martin was a DOE contractor during the performance period of the Equipment Transfer Agreement, and functioned as a property custodian.

record of malice or an intent to injure plaintiff as demonstrated by specific acts of bad faith.

For the foregoing reasons, the government is entitled to summary judgment regarding plaintiff's claim for "other items" from the R/A building.

### 2. Allegedly missing items

#### i. Allegedly stolen third floor R/A building items that were the property of DOE

Plaintiff also contends that during a period when DOE was "unreasonably delaying Mr. Smelser from removing items from the third floor storage area (R/A item no. 1) a number of items were removed from that area by persons unknown." Plaintiff's Opposition at 8. Plaintiff contends that because the items were in a secure area, they could only have been taken by DOE employees or employees of DOE's contractor, Lockheed Martin. Plaintiff contends that DOE made no "real effort to investigate the disappearance of those items or to help Mr. Smelser recover them." *Id.* Plaintiff avers that this gives rise to an inference that DOE was not dealing in good faith or fairly with Mr. Smelser. Plaintiff estimates his loss for the allegedly stolen equipment to be $100.000, yet he describes this figure as "a pure guess." Appendix at 170.

DOE investigated Mr. Smelser's allegations of stolen equipment, yet never uncovered evidence of property being stolen. This fact notwithstanding, DOE offered Mr. Smelser the right to remove an air conditioning motor as compensation for his alleged loss. Appendix at 137 ¶ 19. The government does not dispute that items eligible for removal by Mr. Smelser may have been removed by individuals other than Mr. Smelser.

Aside from the possibility of the existence of an accord and satisfaction for plaintiff's alleged losses, Mr. Smelser's claim cannot prevail in the first instance for failure of proof on plaintiff's part. Mr. Smelser has acknowledged that he has absolutely no idea of what was taken or its value. Accordingly, he is wholly unable to meet his burden of proof with respect to this particular claim on

even the most basic level. In light of the foregoing, no issue of material fact is presented and it is this court's determination that the government is entitled to summary judgment for claimed items allegedly stolen from the third floor of the R/A building.

#### ii. Allegedly moved items that were not the property of DOE

Mr. Smelser complains that DOE allowed Lockheed Martin Utility Services (LMUS) personnel to remove items from the GCEP facility that he was entitled to remove. The government states the only items of property that Mr. Smelser has identified as missing from the storage area located on the 3rd floor of the R/A building are several manlifts and various piping materials. The government argues, however, that the items in question were the property of LMUS and, therefore, are not covered by the Equipment Transfer Agreement. In response to complaints by Mr. Smelser regarding missing property in the R/A building and the F & W building, DOE investigated and determined that LMUS maintenance workers had stored tools and replacement parts in portions of the R/A building and the F & W building. The government contends that these tools and parts were not covered by the Equipment Transfer Agreement as they were not the property of DOE.

Plaintiff does not respond to the government's contention that the removed property actually was the property of Lockheed Martin, and, therefore, there is no genuine issue of material fact as to Smelser's claim for materials removed by Lockheed Martin personnel that was the property of Lockheed Martin, and the government prevails on its motion for summary judgment as to this claim.

### 3. Feed and Withdrawal building electrical items

Mr. Smelser contends that he was permitted to remove a fourth electrical subsystem from the Feed and Withdrawal building pursuant to exhibit B to the contract. This exhibit provides that Mr. Smelser would be permitted to remove from the F & W building all unclassified, uncontaminated

items "except electrical equipment support-ing minimal building services." Appendix at 13. Mr. Smelser contends that during con-tract negotiations he and Mr. Gillespie agreed that "minimal building services" would include only lighting, and that he is entitled to rely upon this agreement. He further avers that because Mr. Gillespie later took a different position regarding the defini-tion of "minimal building services" this indi-cates a lack of good faith and fair dealing.

The F & W building contained four electri-cal subsystems. DOE allowed Mr. Smelser to remove three of the four electrical subsys-tems, but retained the fourth to support min-imal building services. The remaining sub-system allows DOE to provide the following minimal building services to the F & W building:

1. Recirculating heating water and air;

2. Fire protection and alarms;

3. Lighting; and

4. Air handlers for future occupancy.

*See* Declaration of Paulette Williamson, Ap-pendix at 135.

Significantly, "[a] contract is ambiguous only when it is susceptible to two reasonable interpretations." *Hunt Const. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (Fed.Cir. 2002) (quoting *A–Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed.Cir.1994)). The contract must be con-sidered as a whole and interpreted to effectu-ate its spirit and purpose, giving reasonable meaning to all parts. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991). It is with these principles in mind that this court interprets the contractual term "mini-mal building services."

Mr. Smelser contends that "minimal build-ing services" consist only of lighting and, as such, he should be entitled to the fourth electrical subsystem. Mr. Smelser's subjec-tive interpretation of the disputed term is irrelevant to this court's analysis, as is his reliance on his alleged pre-Agreement dis-cussions with Mr. Gillespie. Plainly, however, a definition of minimal building services that includes fire alarm and suppression systems, heating, air and water, and lighting is the only reasonable reading of this contract. As

the government rightfully points out, without the fire suppression systems, the building would fail to meet fire safety codes. Also, DOE requires the placement of fire suppres-sion systems in all buildings exceeding one million dollars in potential lost value. DOE Order 5480.7A, ¶ 9(b)(3), Appendix at 171, 186. Further, these services are intercon-nected, as a fire suppression system would be useless in the winter months unless the building were heated, as the piping could freeze, preventing the fire suppression sys-tem from properly operating. Naturally, the provision of water to the building is integral to the fire suppression system. In sum, Mr. Smelser's interpretation of the term "mini-mal building services" offends a common sense notion of what that term should include and is properly rejected.

■■■ Mr. Smelser's attempt to rely upon parol evidence to interpret the phrase "mini-mal building services" is ineffective as it is not necessary for the court to turn to parol evidence when the writing is integrated and the term in question is unambiguous. *See Sylvania Elec. Products, Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972) (stating that if the written specifica-tions are deemed to be ambiguous or unclear, the oral negotiations are admissible to help clear up the uncertainty).

The court also notes that the government contends and Mr. Smelser does not dispute that two of the electrical subsystems re-quired minor preparation prior to removal and were quickly released. Also, a third subsystem, not identified in the contract, was also released after DOE extensively rewired the building to enable its release to Mr. Smelser.

For the foregoing reasons, the government is entitled to summary judgment regarding Mr. Smelser's claim for the value of the final electrical subsystem.

### 4. PB–1 Building

#### i. Loose items

■■■ Mr. Smelser contends that exhibit B to the contract permitted him to take "all loose items" in PB No. 1. Nevertheless, he contends, DOE refused to release a number

of items, including two mobile manlifts and one or two tractors. The government does not specifically address Mr. Smelser's claim for entitlement to these items. Rather, the government states that "Mr. Smelser fails to identify the equipment that was erroneously withheld from release." Plaintiff's Motion at 15. The government states that Mr. Smesler was allowed to remove unclassified, uncontaminated equipment from PB No. 1 and the R/A building; he removed equipment from those areas and abandoned other equipment in those areas. In the view of this court, there are, however, genuine issues of material fact concerning these items, including: Where the mobile manlifts and tractors were located and whether Mr. Smelser was entitled to remove them; whether the government in fact released these items; and whether, if the government released the items, Mr. Smelser abandoned them. Accordingly, summary judgment is not appropriate as to Mr. Smelser's claim for two mobile manlifts and one or two tractors.

### ii. Heat exchangers

Plaintiff further contends that exhibit B also specifically provides that Mr. Smelser was entitled to the heat exchangers in PB-1. However, DOE refused to give him the heat exchangers, since they had been donated to the Pike County Development and Energy Corporation (Pike County) in 1989, prior to the formation of the Settlement Agreement. At the time of the donation, Mr. Smelser was the Chief Executive Officer of AlChemIE responsible for overseeing the liquidation of various GCEP assets. Appendix at 147–49. Mr. Smelser was not only aware of AlChemIE's donation of the heat exchangers, but approved the donation. Appendix at 168–69. Despite the donation, DOE allowed Mr. Smelser to seek permission from Pike County to cancel the donation, but no permission was ever received by DOE. Appendix 136 at ¶ 18. Thus, having already been donated to Pike County, the heat exchangers were not DOE's to release to Mr. Smelser.

Mr. Smelser avers that at the time he requested release of the heat exchangers, Pike County no longer existed, and that even though Mr. Gillespie knew this he still re-fused to release the heat exchangers. The government's position regarding the heat exchangers is that although there is no dispute that the heat exchangers were specifically identified in exhibit B, their inclusion was the result of a mistake by both parties. The government argues that this mistake does not entitle Mr. Smelser to any relief, as the issue was not a basic assumption and was insignificant to contract formation.

▮ Mr. Smelser cannot establish that he was wrongfully denied the heat exchangers. The heat exchangers had been transferred to Pike County, and this transfer is memorialized in a document appearing in the administrative record at 91–92. Obviously, DOE could only turn over to Mr. Smelser uncontaminated, unclassified equipment that was owned by DOE. Therefore, the inclusion of the heat exchangers into the contract was a mutual mistake by the parties. To recover for a mutual mistake of fact, Mr. Smelser must establish that: (1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation. *See Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed.Cir. 1990) (citations omitted). It is unnecessary for this court to undertake this entire analysis because Mr. Smelser's claim fails as he is unable to establish that the mistaken belief constituted a basic assumption underlying the contract. *See National Presto Industries, Inc. v. United States*, 167 Ct.Cl. 749, 338 F.2d 99, 106–07 (1964), *cert. denied*, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965) (stating that "Courts generally, as well as this court, have been wary in granting relief from innocent mutual mistakes imbedded in … contracts"). An assumption is considered basic if it is a significant part of the bargaining process. *See John Cibinic, Jr. and Ralph C. Nash, Jr.*, ADMINISTRATION OF GOVERNMENT CONTRACTS, 323 (3d ed.1995). Especially in view of the fact that the agreement at issue in this case (1) is a settlement agreement; and (2) involves at least hundreds of items; it is plain that had the parties known that the heat exchangers had

been donated to another entity it would not have affected the Agreement, and therefore the availability of the heat exchangers was not a basic assumption of the contract. Accordingly, the government is entitled to summary judgment as to plaintiff's claim for the heat exchangers.

### f. Areas that may be outside the physical scope of the contract

#### 1. Corridor between the PB-1 building and the R/A building (Transfer Corridor); Assay Room

■■■ Mr. Smelser avers that he was denied access to the loose items, and apparently, electrical equipment, in the corridor between the PB-1 building and the R/A building, despite the fact that (1) DOE had allegedly always "led him to believe" that this Transfer Corridor was a part of PB-1; and (2) the electrical controls in the corridor supported the systems in PB-1. Mr. Smelser also contends that DOE denied him access to the Assay Room, which was "also part of PB-1." Plaintiff's Opposition at 10.

The Equipment Transfer Agreement expressly forbade Mr. Smelser from even entering any areas within the DOE facilities that were not specifically identified in the Equipment Transfer Agreement. Appendix at 5 ¶ 13. Accordingly, argues the government, Mr. Smelser's claim for property located in buildings or areas not identified in the Equipment Transfer Agreement should be denied. Under the terms of the contract, the government contends, because the Transfer Corridor was a separate building not included within the buildings identified in exhibit B, Mr. Smelser was not entitled to remove the inter-plant transfer vehicles, or anything else located in the Transfer Corridor. Similarly, the government contends that the Assay Room was not covered by the terms of the Equipment Transfer Agreement. The Assay Room, the government states, was located within the Central Control Facility building, which was not part of the Equipment Transfer Agreement. Moreover, the piping and components located in the Assay Room were determined by DOE to be contaminated. Appendix 134 at ¶ 11. The gov-

ernment contends that the buildings have entrance markings with different building numbers, which appear as such on the buildings, as well as on every site map of the facility. In support of this assertion, the government cites to the deposition of Thomas Mason Marshall, a Lockheed Martin employee. Significantly, however, in that very deposition Mr. Marshall states that:

> The way that those facilities are assigned, transfer corridor is assigned its own number. CTTF is assigned its own number. I can't remember, I think it's 7727, X-7727. The transfer corridor, I believe, had a designation. So even though it's a part of the building proper, okay, I mean, an integral part of this one complex, they are considered separate entities.... by DOE.

Government's Supplemental Appendix at 49.

There is a genuine issue of material fact in this matter regarding whether the Transfer Corridor and the Assay Room were considered part of the PB-1 building under the Settlement Agreement. The Agreement itself does not speak to this matter, and the term "PB-1" is ambiguous, as it is not clear from the materials before the court whether an adjacent corridor is part of PB-1, and where the Assay Room was situated in relation to PB-1.

The government also argues that even if the court were to find that Mr. Smelser was permitted to remove property from the Transfer Corridor and Assay Room, he has not identified any property in those areas to which he is entitled. Regarding the Transfer Corridor and the Assay Room, the government contends the only property identified in Mr. Smelser's claim that is located in either of these areas are the inter-plant transfer (IPT) vehicles, which were located in the Transfer Corridor, and which Mr. Smelser already received. *See* discussion *infra.* In the view of this court, however, assuming *arguendo* that Mr. Smelser was entitled to remove materials from the Transfer Corridor pursuant to the terms of the contract, there is a genuine issue of material fact as to what loose items and electrical equipment may have been in those areas that Mr. Smelser was entitled to remove.

The government argues that Mr. Smelser has no evidence to challenge DOE's finding that the piping and components were contaminated with nuclear material, and therefore he would not be allowed to remove items in the Assay Room for that additional reason. Mr. Smelser contends that although DOE may claim that certain items in the Assay Room were contaminated, he was advised by representatives of DOE that no evidence of contamination was ever found. In the view of this court, however, even assuming *arguendo* that Mr. Smelser was entitled to remove materials from the Assay Room pursuant to the terms of the contract, there is a genuine issue of material fact as to whether the piping and components in the room were contaminated, thus precluding his removal of items in that room. There is a genuine possibility that the piping and components may have been contaminated with nuclear material, as DOE had enriched uranium in the GCEP facility, specifically in the R/A building, including the CTTF and in PB–1.

The court notes, however, that in a trial Mr. Smelser will have the burden to demonstrate with specificity (1) any items that he alleges he was entitled to; and (2) his entitlement thereto. The court is simply reluctant to deny Mr. Smelser the opportunity to do that at this juncture. As such, the government's motion for summary judgment as to plaintiff's claim for loose items in the Transfer Corridor and Assay Room is denied.

### g. Allegedly contaminated areas

The Equipment Transfer Agreement plainly provides that Mr. Smelser was not entitled to remove any property that was determined by DOE to be contaminated with nuclear material. Appendix at 3 ¶ 9. As discussed *supra*, because DOE had enriched uranium in the GCEP facility, specifically in the R/A building, including the CTTF, and in PB–1, the possibility of contamination was real. Further, the Agreement plainly provides that the final contamination determinations on the property identified in exhibits A and B had not been performed as of the execution date of the Agreement. Appendix at 4 ¶ 9(F)(1). The government contends that Mr. Smelser has failed to identify any evidence that

DOE's contamination determinations were erroneous, nor can he, and the government is entitled to summary judgment in its favor with respect to Mr. Smelser's unsupported challenges to DOE's contamination determinations.

### 1. Quaker Valve Room pipes and valves

■ By way of background, Mr. Smelser was removing equipment from a government facility designed to enrich uranium, a radioactive material with great potential for causing harm. As such, concern for the safety of persons and the environment was of the utmost importance in this contract. Indeed, one of the missions of DOE itself is to ensure that the handling of uranium is performed in a safe manner. Much of the equipment located in several of the GCEP buildings covered by the Equipment Transfer Agreement had been radiologically contaminated during various test runs prior to the cancellation of the GCEP program. Any equipment in the exposure area, which was primarily the R/A building and PB–1, had to be cleared for removal from a safety perspective. In order for property to be cleared for removal, it had to be subjected to a health-physics survey performed by an experienced technician. The health-physics survey involved measuring the amount of radiological contamination upon the property using the appropriate radiological measuring equipment. If the property was free of contamination, it could be released to Mr. Smelser; if not, it was retained by DOE. For property that had been exposed, but was too small to adequately measure, *e.g.,* small tubing and piping, DOE retained the property. *See, e.g.,* Appendix 135–36 at ¶ 16.

During performance, Mr. Smelser requested various valves and piping in the Quaker Valve Room in PB–1, however, DOE did not make these items available to Mr. Smelser as it determined them to be contaminated. The government contends that Smelser's claim as to the various valves and piping he did not receive from the Quaker Valve Room appears to result from Mr. Smelser's failure to understand the specifics of DOE's contamination determination. The Quaker Valve

Room was that portion of PB–1 that contained the piping connections that flowed to the F & W building. It is apparently Mr. Smelser's position that because the F & W building was never used, the equipment in the Quaker Valve Room could not be contaminated. The government states, however, that the valves and piping in the Quaker Valve Room were not contaminated as a result of product flow into that room, but were contaminated because the actual valves and piping had been previously used in DOE's Oak Ridge, Tennessee facility. The Quaker Valve Room and its valves and piping were determined to be contaminated as a result of the health-physics survey. The government contends that Mr. Smelser has not and cannot offer any evidence that would dispute this finding.

In response to the government's argument, Mr. Smelser merely replies that he was advised by representatives of DOE that there was no documentation showing that the equipment in the Quaker Valve Room had ever been put to any use, and that the equipment had been tested and no contamination had been found. This creates a situation where the government contends that "during performance of the Settlement Agreement, DOE discovered that various valves and piping requested by Mr. Smelser was contaminated," and plaintiff contends that "the equipment had been tested and no contamination had been found." The evidence of record reflects that the government has failed to produce either the health-physics survey to support its contention or even an affidavit citing to such survey. The absence of such creates a genuine issue of material fact, and, as such, the government's motion for summary judgment regarding the equipment in the Quaker Valve Room is denied.

### 2. CTTF piping and valves

Mr. Smelser further avers that DOE also refused to release to him numerous items located in the CTTF area of the R/A building, including piping and valves. Plaintiff contends that this constitutes a clear violation of DOE's contract with him.

Exhibit B provided Mr. Smelser access to all uncontaminated, unclassified items in the CTTF, an area within the GCEP R/A building. Appendix at 13. Although Mr. Smelser removed numerous items from the building, DOE refused to release anything determined to be contaminated, including certain stainless steel nickel-plated piping and valves that were exposed to special nuclear material. *See* Appendix at 4 ¶ 9(C) (defining special nuclear material). The government contends that DOE's determination in this regard was consistent with its contractual obligations, as it determined that the piping in the CTTF was exposed to nuclear material and the nature of the piping precluded the type of internal survey required to assure DOE that the equipment was free of nuclear contamination.

The CTTF was one of the areas within the GCEP facility where uranium was enriched. Pursuant to the Equipment Transfer Agreement, to the extent that an area may have been exposed to uranium product, no item could be removed without a determination that the item was free of contamination. Appendix at 2–5. The government contends that because the size of the piping precluded the requisite internal inspection, DOE had no choice but to retain the piping and valves. Appendix at 135–36 ¶ 16. Also, the piping and gauges were not susceptible to a rebuilding process as were the vacuum pumps discussed *infra.* The government contends that DOE's determination that the public health risk was simply too great to release the material to Mr. Smelser was reasonable.

Mr. Smelser does not dispute the government's conclusion that the CTTF piping and valves were contaminated. Because, pursuant to the plain language of the contract, Mr. Smelser was not entitled to remove contaminated equipment, the government is entitled to summary judgment regarding Mr. Smelser's claim for the CTTF piping and valves.

### 3. Vacuum pumps

#### i. Released vacuum pumps

DOE did release vacuum pumps that were attached to the nickel-plated piping and gauges, but they had been contaminated *up until* DOE disassembled the pumps and replaced the contaminated parts with brand

new parts. It was only after DOE disassembled the pumps and replaced the contaminated parts with brand new parts that DOE released the rebuilt pumps. Mr. Smelser claims a breach of contract regarding DOE's actions as to these vacuum pumps. Plaintiff contends that DOE should not, pursuant to the contract, have tested all the pumps for contamination, as it did. Plaintiff contends that the government's refitting the vacuums with new seals drastically decreased the value of the pumps, as the reassembled pumps were worth far less.

Mr. Smelser's contention regarding these vacuum pumps is meritless. For one, insofar as this court can ascertain, DOE was under no contractual obligation to rebuild the vacuum pumps so that Mr. Smelser could remove them. Further, the contract plainly provides that Mr. Smelser could remove "[v]acuum pumps [in] PB–1 North trains 3 & 4 *unless contaminated.*" Appendix at 13 (emphasis added). Accordingly, DOE met and exceeded its duties regarding these vacuum pumps, and the government is entitled to summary judgment regarding Mr. Smelser's claim regarding the vacuum pumps.

### ii. Allegedly non-released R/A building vacuum pump

■■■ Mr. Smelser further avers that DOE also refused to release to him a vacuum pump located in the CTTF area in the R/A building. Pursuant to the contract, Mr. Smelser was entitled to receive a "vacuum pump in the extractor area [of the R/A building], unless . . . classified or contaminated." There are genuine issues of material fact regarding whether Mr. Smelser actually received this vacuum pump, and, if he did not, whether it was contaminated or classified and therefore ineligible for release. Accordingly, the government is not entitled to summary judgment regarding Mr. Smelser's claim for the R/A building vacuum pump.

### h. Inter-plant transfer vehicles and overhead crane

Mr. Smelser also apparently claims damages stemming from a transaction that DOE entered into with Mr. Smelser, pursuant to which he was permitted to remove eight IPTs in exchange for his agreement to leave an R/A building overhead crane, that is listed in exhibit A. This exchange transpired because following the commencement of performance, DOE noted that one of the cranes listed in exhibit A was located over a section of the R/A building that had been certified by the State of Ohio as a hazardous waste storage area. DOE was concerned that removal of the crane might damage the specially constructed floor in the storage area. Thus, DOE offered to exchange the crane for the IPTs. This agreement was reduced to writing and accepted by Mr. Smelser. *See* Appendix at 102. Therefore, the government contends, not only does the Equipment Transfer Agreement fail to support Mr. Smelser's claim for the value of the IPTs, but his claim fails to present a justiciable controversy, as he removed the IPTs in question.

Mr. Smelser's position regarding the IPT vehicles is that DOE did permit him to remove the inter-plant transfer vehicles from the corridor in exchange for a crane that DOE refused to release to him. Mr. Smelser contends, however, that the eight vehicles were items originally conveyed to AlChemIE under its November 20, 1987 agreement, and therefore, became the property of Mr. Smelser when he purchased the AlChemIE property from Anderson County Bank. Mr. Smelser contends that DOE was actually transferring Mr. Smelser's own items to him in exchange for other items it wrongfully withheld.

Although Mr. Smelser apparently seeks some relief for damages allegedly caused to him by this transaction, the government is entitled to summary judgment on this issue because the parties concur that they agreed to this transaction to resolve a dispute about an R/A building overhead crane, and the Appendix reflects this exchange. *See* Appendix at 102. If Mr. Smelser was not satisfied with this arrangement, he should not have agreed to it. Accordingly, Mr. Smelser is entitled to no relief on this claim. Moreover, Mr. Smelser is precluded from recovering for the IPTs for the further reason that the parties entered into the Equipment Transfer Agreement as a settlement between them resolving all disagreements concerning the

prior contract between DOE and Mr. Smelser. Appendix at 1. The parties expressly agreed to release each other from prior claims dating "from the beginning of time to the date of [the] Agreement." Appendix at 7. Thus, to the extent Mr. Smelser possessed a claim for the IPTs under a previous agreement, that claim was released upon the execution of the Equipment Transfer Agreement. Mr. Smelser's failure to include a reservation in the Equipment Transfer Agreement's release provision regarding the IPTs precludes any recovery for this claim. *Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1373 (Fed.Cir. 1999).

### B. Mr. Smelser's excess claims pursuant to the Equipment Transfer Agreement

Mr. Smelser avers generally that DOE withheld numerous excess items from him, to which he alleges he was entitled under the contract. He contends that "he was entitled to all excess personal property, and not just to property falling within some narrow, technical definition of the word 'equipment.'" Plaintiff's Opposition at 14.

Paragraph 2 of the Equipment Transfer Agreement concerns the removal of excess equipment and provides, in part, as follows:

REMOVAL OF EQUIPMENT FROM OTHER DOE FACILITIES

Attached as Exhibit C is a list of excess equipment from DOE facilities that Smelser will be permitted to remove pursuant to this Agreement. In addition to the items described in Exhibit C, DOE shall permit Smelser to remove other equipment determined to be excess by DOE from its Oak Ridge, Tennessee, Paducah, Kentucky, and Piketon, Ohio (PORTS) sites during the term of this Agreement. Smelser understands that on July 1, 1993, custody of a portion of DOE's facilities (including personal property) at Paducah and PORTS will be transferred from DOE to another Government agency, the United States Enrichment Corporation (USEC). Smelser recognizes that this transfer and the terms of the lease between DOE and the USEC will diminish the amount of property potentially reportable as excess to DOE and, hence, available to him. Fi-

nally, it is understood that equipment reported as excess to DOE by its contractors shall be first offered to Smelser before being offered to other DOE contractors or to other government agencies.

Appendix at 1–2.

Mr. Smelser was to have had one year from the date of the Agreement, June 10, 1993, to remove this excess equipment. Because there are two types of excess equipment that Mr. Smelser was entitled to receive pursuant to the contract with distinct legal analyses, it is necessary to analyze them separately.

### 1. Excess equipment specifically delineated on exhibit C to the Equipment Transfer Agreement

██ As set forth *supra*, the contract includes at exhibit C a "list of excess equipment from DOE facilities that Smelser will be permitted to remove pursuant to this Agreement." Appendix at 1. It is entirely unclear based on Mr. Smelser's pleadings to what extent he contends that he did not receive materials which he was entitled to receive pursuant to exhibit C to the contract. Therefore, to the extent plaintiff claims that equipment was not made available to him for removal that is specifically delineated on exhibit C to the Equipment Transfer Agreement, there are genuine issues of material fact as to (1) whether the government properly made the equipment ready for removal by Mr. Smelser; and (2) whether Mr. Smelser abandoned the property in question. Accordingly, the government is not entitled to summary judgment regarding any claim plaintiff may have as to DOE's failure to make available equipment to him for removal that was specifically delineated on exhibit C to the Equipment Transfer Agreement.

### 2. Excess equipment not specifically delineated on exhibit C to the Equipment Transfer Agreement

#### a. Application of the Settlement Agreement to Mr. Smelser's claims for equipment that DOE did not, but allegedly should have, declared as excess

██ The government contends that Mr. Smelser's claim for excess equipment rep-

resents his opinion concerning whether equipment located at the DOE facilities was useful to DOE. Mr. Smelser's assertion is essentially as follows: Despite the contract's placement of responsibility for making excess determinations with the government, the government breached the contract by not offering plaintiff equipment that should have been determined to be excess. Accordingly, plaintiff is seeking the value of certain DOE property that was not declared excess, but which he contends should have been. This assertion must be rejected as a matter of law.[5] In support of his position, plaintiff contends that the term "equipment" in the contract is ambiguous and that, therefore, the court should turn to parol evidence to ascertain the meaning of the term. Plaintiff contends that the court should examine the circumstances surrounding Mr. Smelser's contract with DOE including the construction and performance of previous contracts, the negotiation of the Settlement Agreement, and the performance of DOE and Mr. Smelser under the contract, to ascertain the intent of the contract. He also seeks for the court to examine oral promises that DOE officials allegedly made to him concerning the release or potential release of excess materials.

Mr. Smelser contends that he was entitled to receive, *inter alia,* 130,000,000 pounds of a chemical called Lithium; motor vehicles; items of heavy equipment that "had not been in use for many years and were clearly excess to DOE's needs;" and precious metals. Plaintiff avers that in general, DOE "moved very slowly, if at all, in releasing excess materials to Mr. Smelser from the GCEP facility, with the result that at the end of the

contract term, excess materials worth millions of dollars remained at the GCEP facility." Plaintiff's Opposition at 20. Plaintiff seeks, in general, for the contract to be interpreted as having a broad definition of equipment.

The court begins with the "plain language" when interpreting a contract. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). "A contract is ambiguous only when it is susceptible to two reasonable interpretations." *A–Transport Northwest Co., Inc. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994). When the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls. *Hunt Const. Group, Inc. v. United States,* 281 F.3d 1369, 1373 (Fed.Cir.2002) (citing *Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1469 (Fed.Cir.1998)).

The Equipment Transfer Agreement specifically places responsibility for excess determinations with DOE by providing:

> In addition to the items described in Exhibit C, DOE shall permit Smelser to remove other equipment determined to be excess by DOE from its [Oak Ridge Operation] sites during the term of this Agreement.

Appendix at 1.

There is no ambiguity whatsoever regarding DOE's right to determine what equipment is excess. The contract plainly provides DOE with the discretion to determine whether a piece of equipment is excess to its needs. Pursuant to the plain language of the contract, DOE was fully vested with the authority to determine whether something was excess to DOE's needs.[6] And contrary to

---

5. Also, it bears noting that Mr. Smelser admits that he had no idea of the value of the excess equipment provision and further admits that DOE made no representation concerning the value of the provision. Appendix at 158–66. In fact, Mr. Smelser described the excess equipment provision as "pure[ ] speculation .... [i]t could have been a sandbox, it could have been enough to buy a small country." Appendix at 160. According to Mr. Smelser, the excess provision "was strictly a risk reward venture .... [i]t could have been a homerun or it could have been I struck out before I got off the mark." Appendix at 162. Nonetheless, Mr. Smelser now asserts that the value of the excess agreement provision

exceeds 500 million dollars, despite the fact that he invested approximately $300,000 to obtain the rights to AlChemIE's property interest, and has already removed several million dollars worth of equipment from DOE's facilities during the Access Agreement and Equipment Transfer Agreement periods of performance.

6. In the case of property located at the Oak Ridge Operations sites at issue in this case, the actual property review is conducted by the facility contractor, Lockheed Martin, specifically the Lockheed Martin custodian of the personal property in question.

plaintiff's argument, Mr. Smelser had no role in determining what was excess to DOE's needs. Also, the contractual language "determined to be excess by DOE" qualifies the term "equipment," and, therefore, "equipment" is not the relevant term at issue. The relevant phrase is "other equipment determined to be excess by DOE from its [Oak Ridge Operation] sites during the term of this Agreement." As such, Mr. Smelser's attempt to broadly contend that he was entitled to whatever equipment he deemed to be excess is totally without merit.

Significantly, this court is not, in this instance, to substitute its judgment for that of the DOE official tasked with the responsibility for making the excess determinations. Making such an excess determination requires the possession of specific knowledge of DOE's operations and planned projects, that are ever changing, and the expertise to know how the particular piece of equipment would benefit DOE's planned operations. For example, DOE may wish to retain property that, although not presently being used, may be used on a future project. The contract plainly vested DOE with discretion to make these determinations, and Mr. Smelser was only entitled to that equipment that DOE determined to be excess at the relevant sites during the term of the Agreement. Further, there is no evidence that the government's actions here constitute an abuse of the discretion with which it was vested under the contract.

Mr. Smelser's attempts to define DOE's contractual obligation to make available to him equipment that it determined to be excess during the course of the Agreement as including all types of "equipment" listed on exhibit C to the Settlement Agreement is legally unavailing. By the plain terms of the contract, the equipment listed on exhibit C to the contract is separate and distinct from any equipment that DOE would determine to be excess during the course of contract performance. *See* Settlement Agreement quotation, *supra*. As such, there is no interrelation between these two contractual provisions whatsoever.

And although Mr. Smelser contends that DOE should have been designating items as excess more quickly during the course of performance of the contract, the contract makes no provision regarding the time frame for DOE's determination of excess materials. In fact, the contract does not ensure that any materials would be determined to be excess by DOE. Accordingly, Mr. Smelser cannot, under the plain language of the contract, recover for DOE's alleged failure to move more quickly, as Mr. Smelser would have liked, in designating equipment as excess.

Further, Mr. Smelser is not entitled to rely on any oral representations of DOE representatives made during the course of contract performance in support of his entitlement to equipment not designated as excess by DOE. Even assuming that such comments were made, as previously stated, the contract provides that the Agreement is the entire agreement of the parties. Appendix at 7. Therefore, any alleged oral representations would have no effect and would not be binding upon the parties to vary the terms of the agreement. Similarly, it is of no moment that DOE may have offered Mr. Smelser some items of a certain class that Mr. Smelser wished to receive more of (*e.g.*, motor vehicles) during the course of contract performance. Such actions do nothing to modify the scope of the Agreement.

Plaintiff also contends that pursuant to Rule 56(f) of this court, if the court deems Mr. Smelser's response to defendant's summary judgment motion to be inadequate with regard to the issue of excess items withheld from Mr. Smelser, the court should grant his motion to compel discovery such that plaintiff can collect additional information pertaining to excess materials at the facilities covered by Mr. Smelser's contract during the term of the contract. *See infra* for discussion of plaintiff's motion to compel. This is wholly unnecessary, however, as plaintiff's claim for equipment that DOE did not, but allegedly should have, declared as excess fails as a matter of law. Augmenting the factual record as to this claim would do nothing to further Mr. Smelser's position.

For the foregoing reasons, the government is entitled to summary judgment as to Mr. Smelser's claims for equipment that DOE did

not, but allegedly should have, declared as excess.

### b. Plaintiff's claim for DOE's failure to provide Mr. Smelser access to all excess

■ It is unclear to what extent Mr. Smelser claims that he was not offered all of the equipment, or other items, that DOE *actually determined to be excess during the period of contract performance.* The government contends that "Mr. Smelser does not dispute, with one exception, that he was offered all of the equipment, or other items for that matter, that DOE excessed during the contract period." Defendant's Reply at 17. To the extent that plaintiff claims that he was not offered equipment that was actually excessed during the period of contract performance, there are genuine issues of material fact as to: (1) whether the government properly made the equipment ready for removal by Mr. Smelser; and (2) whether Mr. Smelser abandoned the property in question. Accordingly, the government is not entitled to summary judgment regarding any claim plaintiff may have regarding DOE's failure to provide Mr. Smelser access to equipment, or other items, that DOE actually determined to be excess during the period of contract performance.

### c. Alleged breach of DOE's duty of good faith and fair dealing

Plaintiff also avers generally that with regard to the issues concerning excess property DOE breached its duty of good faith and fair dealing. Plaintiff contends that regarding the excess materials portion of the contract:

> One problem at the GCEP facility was the uncooperative attitude of Mr. Gillespie and of employees of DOE's property custodian contract, Martin. Mr. Smelser, as well as DOE and Martin employees, observed that Tom Robertson, who had an important position dealing with excess at GCEP, had a bad attitude toward Mr. Smelser and his contract, and was uncooperative in getting excess materials to Mr. Smelser. DOE

> made no real attempt to correct this problem.

Plaintiff's Opposition at 20.

Mr. Smelser's bald, unsubstantiated, allegations of bad faith regarding the government's performance of the excess portion of the contract are totally insufficient to establish the existence of a genuine issue of material fact. As discussed, *supra*, a "bland allegation of disparate treatment does not, *ipso facto,* state an actionable claim. Plaintiffs must show a breach of a *contractual* obligation." *Asco–Falcon II,* 32 Fed.Cl. at 604 (emphasis in original). *See also The Libertatia Associates, Inc. v. United States,* 46 Fed. Cl. 702, n. 9 (2000). Indeed, it requires "well nigh irrefragable proof" to establish that the government acted in bad faith. *Kalvar Corp. v. United States,* 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (1976). Plaintiff has wholly failed to present enough evidence to raise a genuine issue of material fact, and, accordingly, the government is entitled to summary judgment as to this claim of bad faith conduct.

### C. Mr. Smelser's overhead claims

■ Mr. Smelser claims that DOE delays increased his costs of performance, as he incurred unanticipated overhead costs of $551,950 as a result of government action. He alleges that he is entitled to overhead for a variety of reasons, including: (1) delays associated with DOE's consideration of plaintiff's proposed removal plan; (2) DOE imposed security and safety restraints; and (3) an alleged plant lock down. The contract at issue in this case is the Equipment Transfer Agreement that provided Mr. Smelser access to DOE property which he could remove and resell for profit. As discussed above, the access took two forms. First, Mr. Smelser was granted six months to remove property from certain areas within DOE's GCEP facility in Portsmouth, Ohio. Second, Mr. Smelser was granted twelve months to remove property DOE determined excess to its needs from DOE's Portsmouth facility, including other GCEP areas, as well as DOE facilities in Oak Ridge, Tennessee, and Paducah, Kentucky. At the expiration of the six month period for GCEP property removal, DOE extended the removal period to twelve

months to enable Mr. Smelser to remove property that he had not removed within the first six months.

This case can be readily distinguished from the typical government contract claim seeking overhead costs related to delay, as the Equipment Transfer Agreement did not contemplate DOE's payment of any money to Mr. Smelser for services performed pursuant to the contract, let alone delay damages. The Equipment Transfer Agreement did not involve a situation whereby Mr. Smelser had to complete tasks in order to receive payment. Rather, the Agreement merely granted Mr. Smelser access to government property. Also significant is the fact that the Equipment Transfer Agreement did not, and was not required, to contain a suspension of work clause or a government delay of work clause. See 48 C.F.R. § 42.1305. There are simply no provisions in the Agreement upon which Mr. Smelser can base his claim.

Further, the Agreement provides that DOE would maintain safety and security at the site during performance of the Agreement. Specifically, the Agreement provides:

> At all times while Smelser is removing equipment, DOE will oversee his activities to assure that safety, health, and security requirements are being followed. Smelser shall comply with safety, health, and security directions from the DOE Representative overseeing his activities.

Appendix at 5.

The Agreement makes no provision concerning the timing of DOE's performance of its health and security measures, and also sets forth no right for recovery if Mr. Smelser did not agree with the time or manner of DOE's performance of these activities.

Further, DOE's extension of the duration of the Equipment Transfer Agreement's six-month period of access to GCEP facilities is not amenable to the concept of unabsorbed overhead. In this case, the more time Mr. Smelser was granted access to the GCEP facility, the more property he could remove and resell. Conversely, the less time granted, the less property would be available to Mr. Smelser, and accordingly, fewer sales. Thus, any additional costs incurred in a long-er period of time were absorbed by the increased sales made from the property which would not have been removed had a shorter period of time for removal been available. By DOE's extension of the contract period, it was not demanding that Mr. Smelser actually send a crew to the site for six months, but was simply enlarging the grace period by which Mr. Smelser could increase his sales and, his profits, by taking more property out of the facility than could be accomplished within the original six-month period.

For the foregoing reasons, the government is entitled to summary judgment regarding Mr. Smelser's claims for overhead damages stemming from delay.

## III. Plaintiff's Motion to Compel

Plaintiff filed a motion to compel discovery on November 14, 2000, wherein he seeks to compel the defendant to supplement its answers to plaintiff's interrogatories and responses to plaintiff's request for production of documents. On June 12, 2001, the defendant filed its response to plaintiff's motion to compel discovery, wherein it requests that Mr. Smelser's motion be denied, and maintains that all responsive information that it has discovered has been provided to Mr. Smelser.

Upon a review of Mr. Smelser's motion to compel, it appears that much of the motion focuses on gaining information to assist him in establishing his claims for equipment that DOE did not, but allegedly should have, declared as excess. As discussed in detail above, this claim, along with many other of Mr. Smelser's claims, has been disposed of through the pending motion for summary judgment. Accordingly, many if not most of the requests in Mr. Smelser's motion to compel are rendered moot by virtue of this court's opinion on the motion for summary judgment. Because Mr. Smelser's motion to compel does not clearly specify for which particular claims he is seeking to compel particular information, it would be an impossible task for this court to discern what requests remain extant following this court's opinion on the motion for summary judgment. Also, in its response to the plaintiff's motion to compel, the government states that

it produced to Mr. Smelser at least some of the information which he was seeking in the intervening period between the plaintiff's submission of its memorandum in support of motion to compel discovery and the government's response. In sum, much of Mr. Smelser's motion to compel may, at this juncture, actually be moot, and the court is unable to discern from the motion which portions of it may not be moot.

Accordingly, the court denies plaintiff's motion to compel discovery filed November 14, 2000. The court urges counsel for Mr. Smelser to carefully revisit his previous motion in view of this court's decision on the motion for summary judgment and any intervening discovery since he initially filed his motion to compel. Should counsel for Mr. Smelser decide that despite the relevant intervening circumstances it is necessary to seek further discovery, then he may submit his appropriately modified request to counsel for the government prior to filing another motion to compel in this court. The court urges Mr. Smelser to be judicious in seeking further discovery, as the parties have already engaged in extensive and voluminous discovery in this matter. Any modified request for discovery must be clearly written; well-organized; and above all, narrowly tailored. The parties are urged to resolve this dispute amongst themselves, and plaintiff is to seek redress in the court only as a last resort.

As a final note, the court takes this opportunity to urge the parties to contemplate the feasibility of settlement at this juncture. Inasmuch as several of plaintiff's claims have been resolved in this decision, settlement might be prudent for the remaining issues without the need for further costly litigation.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1) The government's motion for summary judgment filed April 8, 2002 is **GRANTED, in part** and **DENIED, in part.** Specifically, it is ordered as follows:

  (a) The government's motion for summary judgment is **DENIED** regarding:

    (1) Plaintiff's claim for the abandoned cranes;

    (2) Plaintiff's claim that he did not receive the two generators to which he was entitled pursuant to the contractual language stating he could remove "[t]wo of the four diesel generators (one at each end of PB–1)," to the extent that Mr. Smelser actually claims that he did not actually receive these generators;

    (3) Plaintiff's claim for two mobile manlifts and one or two tractors;

    (4) Plaintiff's claim for loose items in the Transfer Corridor and Assay Room;

    (5) Plaintiff's claim regarding the equipment in the Quaker Valve Room;

    (6) Plaintiff's claim for the allegedly non-released R/A building vacuum pump;

    (7) Any claim plaintiff may have as to DOE's failure to make available equipment to him for removal that was specifically delineated on exhibit C to the Equipment Transfer Agreement; and

    (8) Any claim plaintiff may have regarding DOE's failure to provide Mr. Smelser access to equipment, or other items, that DOE actually determined to be excess during the period of contract performance.

  (b) The government's motion for summary judgment is **GRANTED,** and as there is no just reason for delay pursuant to RCFC 54(b), the Clerk's office is directed to enter judgment in favor of defendant regarding:

    (1) Plaintiff's claim for the CTTF cranes;

    (2) Plaintiff's claim for empty casings;

    (3) Plaintiff's claims for the *additional* two Caterpillar generators in the PB–1 building beyond those to which he was entitled pursuant to the contractual language stating he could remove "[t]wo of the four diesel generators (one at each end of PB–1)";

    (4) Plaintiff's claim for "other items" from the R/A building;

(5) Plaintiff's claims for items allegedly stolen from the third floor of the R/A building;

(6) Plaintiff's claim for materials removed by Lockheed Martin personnel that was the property of Lockheed Martin;

(7) Plaintiff's claim for the final electrical subsystem in the Feed and Withdrawal building;

(8) Plaintiff's claim for heat exchangers;

(9) Plaintiff's claim for the CTTF piping and valves;

(10) Plaintiff's claim regarding the vacuum pumps released from PB–1 North trains 3 & 4;

(11) Plaintiff's claim for damages stemming from a transaction that DOE entered into with Mr. Smelser, pursuant to which he was permitted to remove eight IPTs in exchange for his agreement to leave an R/A building overhead crane, that is listed in exhibit A;

(12) Plaintiff's claims for equipment that DOE did not, but allegedly should have, declared as excess;

(13) Plaintiff's claim of bad faith conduct on the part of DOE regarding the issues concerning excess property; and

(14) Plaintiff's claims for overhead damages stemming from delay.

(2) Plaintiff's motion to compel discovery filed November 14, 2000 is **DENIED;** and

(3) Counsel for the parties shall **FILE** a **Joint Status Report** on or before **October 1, 2002.**