John H. SMELSER, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–635C.

United States Court of Federal Claims.

Nov. 2, 2004.

---

Mr. Edward Owens, Jr., Lewis, King, Krieg & Waldrop, P.C., of Knoxville, Tennessee for Plaintiff.

Mr. Martin F. Hockey, Jr., Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

WILLIAMS, Judge.

Plaintiff claims that the Department of Energy (DOE) breached a contract by refus-

ing to allow him to remove certain excess chemicals and equipment from DOE's Oak Ridge facilities. In an earlier opinion granting partial summary judgment for Defendant, the Court concluded that Plaintiff was not entitled to these excess chemicals under the contract, and that genuine issues of material fact precluded summary judgment as to other equipment Plaintiff is claiming. *Smelser v. United States*, 53 Fed.Cl. 530 (2002) (*Smelser I*), *aff'd*, 69 Fed.Appx. 466 (Fed.Cir.2003).[1]

This matter comes before the Court on another round of motions—Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross–Motion for Summary Judgment. Plaintiff again claims entitlement to these same excess chemicals, lithium and a chemical compound known as PDMCH. Because this Court, in a decision affirmed by the Federal Circuit, definitively ruled that Plaintiff was not entitled to these excess chemicals under the contract, these claims are barred under the law-of-the-case doctrine. *Smelser I*, 53 Fed.Cl. at 552–53, 556.

Genuine issues of material fact preclude summary judgment on the remaining equipment claims.

### Factual Background[2]

Plaintiff became the CEO of All Chemical Isotope Enrichment, Inc. (ACIE) in May 1988. On November 20, 1987, ACIE entered into a contract with the Government, the "Centrifuge Equipment Agreement and Bill of Sale," which entitled ACIE to remove materials from DOE's Gas Centrifuge Enrichment Plant (GCEP) near Piketon, Ohio, a facility which was built but never operated.

Plaintiff's one-year employment contract with ACIE expired in May 1989 and was not renewed. ACIE subsequently declared bankruptcy and pledged its right to the GCEP material as collateral for a bank loan. Plaintiff purchased the pledged right to the GCEP material at foreclosure, but DOE did not permit him to remove it.

On January 23, 1992, Plaintiff and DOE representatives entered into a settlement agreement which permitted Mr. Smelser to remove equipment from GCEP according to a schedule. The term "equipment" was not defined. Once Plaintiff had removed everything DOE permitted him to remove under the contract, Plaintiff demanded compensation for DOE's interference with his removal of other items to which he was entitled.

Plaintiff and DOE entered into a settlement agreement under which DOE allowed him to remove excess material from other DOE facilities, including Oak Ridge, Tennessee and Paducah, Kentucky. This agreement of June 10, 1993, the "Equipment Transfer and Settlement Agreement," (contract) is at issue in this case.

The contract provided that Plaintiff could remove equipment specifically listed in Exhibits A, B, and C to the contract. Exhibit C included some excess equipment. The contract permitted Mr. Smelser to remove "other equipment" determined to be excess by DOE during the term of the contract in addition to the excess items described in Exhibit C. The contract term was twelve months, beginning June 10, 1993, but Plaintiff initially had only six months, until December 10, 1993, to remove material listed in Exhibits A and B. The initial six-month period was extended by agreement of the parties, until June 10, 1994, for removal of all equipment under the contract.

Two limitations under the contract are relevant here. First, equipment offered to Plaintiff but not removed before the expiration of the twelve-month period was deemed abandoned. Second, Mr. Smelser was not allowed to "attempt to remove any equipment which [was] classified or contaminated with special nuclear material." Smelser Aff., Oct. 17, 2003, Attachment C, Contract at 87.

### Discussion
### Standard of Review

Under Rule 56(c) the Rules of the Court of Federal Claims (RCFC), summary judgment

---

1. The earlier opinion was authored by the Honorable Lynn J. Bush, and this case was subsequently transferred to the undersigned.

2. The background is related in detail in *Smelser I,* and is repeated here as necessary for ease of reference. The factual background is further derived from the affidavits and documents in appendices to the motions *sub judice.*

is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See also Anderson'v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on summary judgment, a court does not weigh the evidence to determine the truth of the matter, but rather assesses whether there is a genuine issue for trial. *Id.* at 248–49, 106 S.Ct. 2505; *Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002). Further, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The movant bears the initial burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant then bears the burden of showing sufficient evidence of a material fact in dispute that would allow a fact finder to decide the case in its favor. *Liberty Lobby, Inc.,* 477 U.S. at 256, 106 S.Ct. 2505. It is not necessary that such evidence be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987).

When considering cross-motions for summary judgment, the court evaluates each motion under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. 450, 457 (1999). If genuine disputes exist over material facts, both motions must be denied. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

### *Law of the Case*

■ Because this Court squarely denied Plaintiff's claims of entitlement to items which were not declared excess by DOE but should have been—including lithium and PDMCH—Plaintiff cannot resuscitate these claims in a new round of motions. It is well established that "the law of the case doctrine authorizes a court to 'refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation.' " *Stockton E. Water Dist. v. United States,* 62 Fed.Cl. 379, 392–93 (2004) (quoting *Suel v. Sec'y of HHS,* 192 F.3d 981, 985 (Fed.Cir.1999)). In *Suel,* our appellate authority explained:

> Law of the case is a judicially created doctrine, the purpose of which is to prevent relitigation of issues that have been decided. *See Gould, Inc. v. United States,* 67 F.3d 925, 927–28 (Fed.Cir.1995). The doctrine operates to protect the settled expectations of the parties and promote orderly development of the case. *See Mendenhall v. Barber–Greene Co.,* 26 F.3d 1573, 1582 (Fed.Cir.1994); *Little Earth of the United Tribes v. Department of HUD,* 807 F.2d 1433, 1441 (8th Cir.1986). It "ensures judicial efficiency and prevents endless litigation. Its elementary logic is matched by elementary fairness—a litigant given one good bite at the apple should not have a second." *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 890 (Fed.Cir.1984).

192 F.3d at 984–85.

■ The Court in *Smelser I* granted Defendant's motion for summary judgment with regard to "[p]laintiff's claims that he was entitled to equipment that DOE did not, but should have, declared as excess." 53 Fed.Cl. at 556. It was under this category that the Plaintiff in *Smelser I* placed its claims for lithium and PDMCH. Nonetheless, Plaintiff again claims that he is entitled to 130,000,000 pounds of lithium that DOE was in the process of releasing on the open market when he signed the contract. Plaintiff also alleges that while DOE permitted him to remove 500,000 pounds of PDMCH, it refused to release another 100,000 pounds of this material. Both of these claims have been rejected by this Court.

In addressing DOE's determination of "excess equipment" the Court in *Smelser I* engaged in a careful analysis of the language of the contract:

> There is no ambiguity whatsoever regarding DOE's right to determine what

equipment is excess. The contract plainly provides DOE with the discretion to determine whether a piece of equipment is excess to its needs. Pursuant to the plain language of the contract, DOE was fully vested with the authority to determine whether something was excess to DOE's needs. And contrary to plaintiff's argument, Mr. Smelser had no role in determining what was excess to DOE's needs. Also, the contractual language "determined to be excess by DOE" qualifies the term "equipment," and, therefore, "equipment" is not the relevant term at issue. The relevant phrase is "other equipment determined to be excess by DOE from its [Oak Ridge Operation] sites during the term of this Agreement." As such, Mr. Smelser's attempt to broadly contend that he was entitled to whatever equipment he deemed to be excess is totally without merit.

*Smelser I,* 53 Fed.Cl. at 551–52.[3]

Although PDMCH was not referenced by name in *Smelser I,* it is clear that the decision encompassed this chemical compound which Plaintiff expressly had claimed DOE should have declared as excess, but did not. A review of the parties' earlier motion papers establishes that Plaintiff claimed both PDMCH and lithium as equipment DOE should have, but did not declare excess. Aff. of John H. Smelser, May 15, 2002, ¶ 48; Plaintiff's Response to Defendant's [Prior] Motion for Summary Judgment, May 22, 2002, at 18. The Court in *Smelser I* broadly granted the Government summary judgment "as to Mr. Smelser's claims for equipment that DOE did not but allegedly should have declared as excess." 53 Fed.Cl. at 552–53. The decision did not recite seriatim all of the items Plaintiff claimed should have been de-

clared excess, but instead listed lithium, motor vehicles and heavy equipment, *"inter alia,"* thus indicating other unspecified items were in this category. *Id.* at 551. The law-of-the-case doctrine applies not only to issues decided explicitly, but also to everything decided "by necessary implication." *Cf. In re Felt,* 255 F.3d 220, 225–26 (5th Cir.2001) (quoting *Browning v. Navarro,* 887 F.2d 553, 556 (5th Cir.1989)). Here, in entering summary judgment denying all claims for equipment which should have been declared excess, the Court necessarily included Plaintiff's claim for PDMCH.[4]

Having been decided in *Smelser I,* Plaintiff's claims for damages relating to DOE's refusal to release lithium and additional PDMCH are barred. *Cf. Gould, Inc. v. United States,* 67 F.3d 925, 930 (Fed.Cir. 1995) (explaining that under the law-of-the-case doctrine, a court adheres to a prior decision in the same case unless one of three exceptional circumstances exist: (1) the evidence in a subsequent trial is substantially different; (2), controlling authority has since made a contrary decision of the law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice). *Id.* at 930. None of these exceptions apply here.

### The Remaining Equipment Claims

In *Smelser I,* the Court denied Defendant's motion for summary judgment regarding nine claims for additional equipment. Plaintiff has conceded two of those claims regarding two caterpillar generators and additional items listed on Exhibit C. Pl.'s Response at 2, 5. Defendant has now asked the Court to grant summary judgment in its favor regarding the remaining claims, but

---

**3.** Plaintiff also suggests that because DOE had determined lithium and PDMCH to be excess *prior* to the signing of the contract, he is entitled to them. This argument fails because the Court determined that the contract provided that Mr. Smelser was only entitled to receive equipment determined by DOE to be excess *"during* the term of the [contract]." 53 Fed.Cl. at 550 (emphasis added).

**4.** Nor can Plaintiff introduce evidence to alter the clear terms of the contract. As the court in *Smelser I* ruled:

Mr. Smelser is not entitled to rely on any oral representations of DOE representatives made during the course of contract performance in support of his entitlement to equipment not designated as excess by DOE. Even assuming that such comments were made ..., the contract provides that [it] is the entire agreement of the parties. Therefore, any alleged oral representations would have no effect and would not be binding upon the parties to vary the terms of the [contract].

*Smelser I,* 53 Fed.Cl. at 552.

Plaintiff argues that genuine issues of material fact exist with regard to the following seven remaining claims:

1. Abandoned cranes
2. Two mobile manlifts and one or two tractors
3. Loose items in the Assay Room
4. Loose items in the Transfer Corridor
5. Equipment in the Quaker Valve Room
6. R/A building vacuum pump
7. DOE's failure to provide Plaintiff access to equipment, or other items, that DOE actually determined to be excess during the period of contract performance

### *Abandoned Cranes*

■ Plaintiff seeks damages for overhead cranes he claims DOE forbade him to remove. Of the 44 cranes eligible for removal, Mr. Smelser only removed 15, and Defendant contends that Mr. Smelser "abandoned" the other 29 cranes. 53 Fed.Cl. at 537. In the prior opinion, the Court declined to grant Defendant's motion for summary judgment with regard to the cranes stating:

Significant material issues remain, however, as to (1) when the cranes were made available to Mr. Smelser; (2) whether it was reasonable for the government to make at least some of the cranes available only a "few weeks" prior to the deadline for removal, and (3) whether it would have been possible for Mr. Smelser to remove all of the cranes during that period of time. Issues also remain as to (1) when Mr. Smelser removed his workmen from the site; and (2) how many cranes Mr. Smelser would have been able to remove even if the government had released the cranes earlier, as Mr. Smelser removed his workmen from the site at some point well before the completion of the performance period.

*Smelser I,* 53 Fed.Cl. at 538.

In an affidavit submitted in the first round of motions, Mr. Smelser stated that DOE's delays in providing air-gapping prevented

him from removing many of the cranes.[5] He testified: "[m]ost of the cranes were not released for my removal until a few weeks before the June 10, 1994 deadline." Smelser Aff., May 15, 2002, ¶ 30. However, in response to the pending motion, Plaintiff submitted an affidavit admitting that he was mistaken in his earlier testimony that the cranes were not released until six months later. He had confused the original contract deadline of December, 1993, with the new deadline of June, 1994, set by DOE because of DOE's delays in making equipment available. Aff. of John H. Smelser, Jr., Feb. 12, 2004 (Third Smelser Aff.), ¶ 3. He further testified that a different reason, not previously mentioned, prevented his removal of the cranes, *i.e.,* that DOE had painted the floor underneath the cranes with a sealant and then placed numerous drums of hazardous waste underneath them. Specifically, Plaintiff testified:

Shortly after I signed my June 10, 1993 contract with DOE, DOE painted the flooring underneath these cranes with a sealant, making it impossible to remove the cranes while the sealant was drying. When the sealant was dry, DOE then placed a large number of barrels of hazardous waste on the flooring underneath the cranes, making it impossible to get to the cranes to move them and creating a real risk that one or more of the drums of hazardous waste might be punctured during any attempted removal of the cranes. After the hazardous waste drums were placed under the cranes, Eugene Gillespie, DOE's site manager for the facility, stated to me that he did not see how anyone could remove the cranes. At the time that my contract with DOE, as extended, expired in June 1994, the barrels of hazardous waste were still on the floor underneath the cranes.

Third Smelser Aff., ¶ 2.

Defendant urges the Court to conclude that Plaintiff's most recent affidavit contradicts his earlier affidavits and should be discounted because the only reason Mr. Smelser

---

**5.** "Airgapping is the process by which electrical hookups are disconnected from the cranes." 53

Fed.Cl. at 537.

articulated for failing to remove the cranes in his earlier affidavit was DOE's untimely release. Such an analysis would be inappropriate. On summary judgment, this Court must view the evidence in the light most favorable to the nonmoving party, and may not weigh the evidence or assess its credibility. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed.Cir.2002); *McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir.1988) (reversing summary judgement where the court disregarded defendant's declaration and sworn answers to interrogatories as "implausible").[6]

Defendant points out that Mr. Smelser previously stated that he was prevented from removing *one* crane because DOE had placed hazardous materials beneath that crane, not the 28 cranes he is now claiming.[7] Defendant urges the Court to conclude that the 27 other cranes were not located within the same area as the single crane which was located over the hazardous waste. Defendant cites Crane Release Sheets which demonstrate that 12 cranes were located in the R/A building. Defendant contends that these cranes were not located in the area where the hazardous waste was stored, citing Defendant's Appendix 10–15. Although the Crane Release Sheets in this Appendix indicate that certain cranes were located in the R/A electrical area, the precise location within that area was left blank, and the record does not indicate where hazardous material was stored. Nor does the record indicate whether the other cranes were located near hazardous waste.

There are genuine issues of material fact regarding whether Plaintiff abandoned the cranes or was unable to remove them.

### The Manlifts and Tractors

 Plaintiff claims that he was entitled to remove two manlifts and two tractors located in the PB–1 building as the contract permit- ted him to take "all loose items" located in that building. *Smelser I*, 53 Fed.Cl. at 546. In *Smelser I*, this Court denied this aspect of the Government's motion for summary judgment because the Government did not specifically address these manlifts and tractors. 53 Fed.Cl. at 545. The Court explained:

> [There are] genuine issues of material fact concerning these items, including: Where the mobile manlifts and tractors were located and whether Mr. Smelser was entitled to remove them; whether the government in fact released these items; and whether, if the government released the items, Mr. Smelser abandoned them.

*Id.*

In an effort to address these issues, Defendant has submitted the declaration of Thomas M. Marshall, who was at the relevant time, a building custodian working for Martin Marietta (MM), the facilities contractor at Portsmouth. Shortly after commencement of the contract, Mr. Marshall "was chosen to be the interface for Mr. Smelser's contract for all aspects of the agreement that were related to ... removal of items from the Gaseous Diffusion Plant." Decl. of Thomas M. Marshall, Jan. 15, 2004, (Marshall Decl.), ¶ 1. The entirety of Mr. Marshall's testimony on this point is:

> During contract performance, Mr. Smelser claimed he was entitled to manlifts/tractors that were discovered in both the R/A and PB–1 Buildings, but my investigation revealed that the manlifts in question had been inadvertently left in both buildings by MM maintenance crews who were doing maintenance work in the buildings. When it was brought to the attention of the maintenance department that Mr. Smelser was removing equipment from the buildings in question, the maintenance department removed their [sic] equipment. Thus, the maintenance equipment was nev-

---

6. Defendant has not alleged that Mr. Smelser's affidavit is a "sham." Defendant does not contend that the affidavit contradicts earlier deposition testimony. *See generally Leslie v. Grupo ICA,* 198 F.3d 1152 (9th Cir.1999)(recognizing that a court may disregard a "sham" affidavit that a party files to create an issue of fact by contradicting the party's prior deposition testimony).

7. The Court in *Smelser I* concluded that the parties had reached an accord and satisfaction by virtue of the Government's agreement to release eight inter-plant transfer vehicles to Mr. Smelser in exchange for Mr. Smelser's agreement to waive his rights to this single crane located over the hazardous waste storage area. 53 Fed.Cl. at 549.

er considered part of the buildings and Mr. Smelser was not allowed to remove the equipment, which was the property of the maintenance department.

Marshall Decl., ¶ 3.

Defendant has failed to meet its initial burden of establishing the absence of a genuine issue of material fact as to these manlifts and tractors. Mr. Marshall's testimony in its vagueness confuses this issue—he says only that *"the* maintenance department removed their [sic] equipment," not whose maintenance department, DOE's or MM's. The Court cannot conclude there is no genuine issue based on dubious inference or speculation. Moreover, Mr. Smelser testified that although the two manlifts and associated tractors may have been operated by MM from time to time, they were owned by DOE, free from contamination and within an area designated for him to remove items. This conflicting testimony further highlights the existence of a genuine issue of material fact regarding the ownership of the manlifts and tractors. Defendant is not entitled to summary judgment with regard to the manlifts and tractors.

### Loose Items in the Assay Room

■ Plaintiff claims that he was entitled to remove loose items in the Assay Room which DOE had denied to him on the ground that they were contaminated. Plaintiff claims that, despite his repeated requests, "[the] items were never tested for contamination and were only labeled as 'potentially' contaminated." Third Smelser Aff., ¶ 5.

Defendant has submitted the declaration of Phillip Borris, the MM facilities contractor who supervised the Radiological Control Technicians in the performance of radiological surveys in the Portsmouth facility during the contract period. Mr. Borris states that the "assay [room] related valves and piping were exposed to nuclear material and determined to be contaminated by DOE...." Decl. of Philip Borris, Jan. 16, 2004 (Borris Decl.), ¶ 3. Mr. Borris explains:

I am [ ] familiar with Mr. Smelser's allegations concerning the Assay Room located in X–3012. The Assay Room contained equipment associated with product assay sampling from the operation of two centri-

fuge trains located in PB–1, which were actually used during the testing process prior to the program being cancelled by Congress. As such, these assay related valves and piping were exposed to nuclear material and determined to be contaminated by DOE and posted as such pursuant to DOE order 5480.11.

*Id.* In response, Plaintiff testified:

None of the items in the Assay Room were ever identified as contaminated. In fact, these items were never tested for contamination, but were labeled as "potentially" contaminated. Despite my repeated requests, not only during the term of my June 10, 1994 contract, but also during previous contracts with DOE for removal of equipment at the facility, the items were never tested.

Third Smelser Aff., ¶ 5.

Plaintiff's assertion that these items were never tested for contamination directly controverts the testimony of Mr. Borris that the valves and piping were tested and determined to be contaminated. As such, defendant is not entitled to summary judgment with regard to the loose items in the Assay Room.

### Loose Items in the Transfer Corridor

■ In *Smelser I,* the Court held that there was a genuine issue of material fact regarding whether Plaintiff was permitted to remove items in the corridor between the PB–1 building and the R/A building (Transfer Corridor). 53 Fed.Cl. at 555. Plaintiff has alleged that there were items in the Transfer Corridor to which he was entitled, stating:

I personally observed at least 400 to 500 items of equipment that were in the Transfer Corridor and were never transferred to me, including but not limited to testing equipment, vacuum systems, motors, and electrical equipment that was not connected to any building.

Third Smelser Aff., ¶ 6. Defendant points to the contract which forbade Plaintiff from entering DOE facilities not listed in the contract and argues that the Transfer Corridor was an independent building not listed in the

contract. Defendant also argues that the only equipment in the corridor were Interplant Transfer Vehicles (IPTs) which were removed by Plaintiff by agreement of the parties, in exchange for Plaintiff's release of a claim for an overhead crane located in the R/A building.

It is not possible to determine, based on the record before the Court, whether the Transfer Corridor was in fact a separate building or whether it was considered part of one of the buildings listed in the contract. Nor can the Court ascertain what items were in the corridor. As such, the Court denies summary judgment regarding items in the Transfer Corridor.

### Quaker Valve Room Equipment

■ Plaintiff asserts that he was entitled to various valves and piping in the Quaker Valve Room in PB–1 which DOE denied him after determining that the material was contaminated. In *Smelser I*, the Court denied summary judgment with regard to this equipment because the Government had failed to produce any health-physics surveys or an affidavit to support the contention that the equipment in question was contaminated.[8]

Defendant has now submitted a declaration of the Martin Marietta representative who supervised technicians performing radiological surveys in the Portsmouth facility during performance of the contract. Mr. Borris testified in his declaration:

> Mr. Smelser claims that certain G–17 valves located in the Quaker Valve room at the Portsmouth facility were not contaminated. I specifically recall the valves in question and can testify that these were determined to be contaminated and were in fact identified as such at the time of Mr. Smelser's contract by the placement of tags upon the equipment indicated [sic] the contaminated nature of the equipment pursuant to DOE order 5480.11. At the time

of Mr. Smelser's contract, I was aware that many of the valves in question had actually been rebuilt at DOE's Oak Ridge facility and sent to Portsmouth, with the proviso that these valves were to be treated as contaminated with nuclear material. It was my understanding that Mr. Smelser was not allowed access to contaminated equipment.

Borris Decl., ¶ 2. In response, Plaintiff testified in his affidavit:

> In its Motion for Summary Judgment, Defendant also refers to allegedly contaminated equipment in the Quaker Valve Room. However, this equipment was never actually tested for contamination. Instead, DOE advised me that they considered it to be "potentially" contaminated. Despite my repeated requests, they never tested this equipment and never released it to me.

Third Smelser Aff., ¶ 7. In denying summary judgment on this issue in *Smelser I*, the Court stated:

> The evidence of record reflects that the government has failed to produce either the health-physics survey to support its contention or even an affidavit citing to such survey. The absence of such creates a genuine issue of material fact ...

53 Fed.Cl. at 548.

Mr. Borris did not address the health-physics survey in his declaration, and defendant has still not produced the survey indicating that the material was tested. The Court is left with conflicting testimony in the affidavit of Mr. Smelser and the declaration of Mr. Borris, reciting recollections over 10 years old, when a health-physics survey which presumably reflected any contamination, could have been produced. Under the circumstances, summary judgment will not be granted.

---

**8.** The Court in *Smelser I* explained that health-physics surveys were performed to determine whether materials were contaminated:

> In order for property to be cleared for removal, it had to be subjected to a health-physics survey performed by an experienced technician. The health-physics survey involved

measuring the amount of radiological contamination upon the property using the appropriate radiological measuring equipment. If the property was free of contamination, it could be released to Mr. Smelser; if not, it was retained by DOE.

53 Fed.Cl. at 547.

### R/A Building Vacuum Pump

■ Plaintiff claims that a vacuum pump "in the CTTF area of the R/A building" was wrongfully withheld and that "DOE refused to test it for contamination and never identified it as contaminated." Third Smelser Aff., ¶ 8. Defendant counters that it has no idea to which pump Plaintiff is referring:

> There were numerous vacuum pumps released to Mr. Smelser, which he removed from the facility. There were a few vacuum pumps that were contaminated with nuclear material, and, therefore, were not released, pursuant to the contract. Thus, we believe that Mr. Smelser should identify with specificity the vacuum pump to which he refers, or this allegation should be dismissed.

Def.'s Cross–Motion for Summ. J. at 13.

Plaintiff has testified that there was a vacuum pump located in the R/A Building that DOE refused to release to him, which DOE never identified as contaminated and refused to test for contamination. Third Smelser Aff., ¶ 8. Defendant's claim that Plaintiff's description of the item is not specific enough for it to understand what Plaintiff is claiming does not justify granting summary judgment in Defendant's favor. Plaintiff's factual allegations must be accepted as true and all inferences drawn in his favor.

### Other Equipment Actually Excessed

■ Plaintiff also claims DOE failed to provide him access to "other equipment" which was determined to be excess during the term of the contract. The Court in Smelser I held that there were genuine issues of material fact as to "(1) whether the government properly made the equipment ready for removal by Mr. Smelser; and (2) whether Mr. Smelser abandoned the property in question," and denied Defendant's request for summary judgment. Smelser, 53 Fed.Cl. at 553. Plaintiff argues that DOE's sale of tires, transfer of property from DOE to the United States Enrichment Corporation (USEC), sale of excess property at the Ohio GCEP facility, and transfer of DOE computers, microscopes, and other test equipment to universities and other institutions violated DOE's contractual obligation to make excess material available to him. Pl.'s Response to Def.'s Mot. for Summary J. at 5–6.

Defendant concedes that it disposed of used tires covered under the contract to a local tire company without first determining if Plaintiff was interested in them. Def.'s Cross–Motion for Summ. J. at 14. Defendant claims that immediately upon learning of Plaintiff's interest in those tires, DOE made them available to Plaintiff, but Plaintiff made no attempt to remove the tires, and they were deemed "abandoned." Plaintiff counters that DOE, after selling all the valuable tires, turned over only the remaining, less valuable tires to him, none of which were worth taking, and that DOE never reimbursed him for this violation of the contract.

Plaintiff has also alleged that DOE disposed of other excess items that he should have had an opportunity to remove. In one instance, Plaintiff alleged that although a contract between DOE and USEC required USEC to select excess equipment from DOE facilities by November 1, 1993, DOE did not enforce this deadline, and allowed USEC to remove numerous items of excess equipment which should have been released to Mr. Smelser.

There are genuine issues of material fact regarding whether DOE disposed of other excess items without first offering such equipment to Plaintiff. At trial, Plaintiff will have the burden of establishing that items declared as excess by DOE during the term of the contract were offered to other entities before being offered to him.

### Conclusion

1. Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

2. Defendant's Cross–Motion for Summary Judgment is **GRANTED IN PART**. Plaintiff's claims for damages for breach of contract with respect to DOE's failure to permit Plaintiff to remove lithium and PDMCH are **DENIED**.

3. Defendant's Cross–Motion for Summary Judgment is **DENIED** with regard to all remaining claims, to wit:

 • Abandoned cranes

- Two mobile manlifts and one or two tractors
- Loose items in the Assay Room
- Loose items in the Transfer Corridor
- Equipment in the Quaker Valve Room
- R/A building vacuum pump
- DOE's failure to provide Plaintiff access to equipment, or other items, that DOE actually determined to be excess during the period of contract performance.

4. The Court will convene a telephonic conference on **November 12, 2004 at 10:30 am EST** to schedule this case for trial.